[Crim. No. 17592. In Bank. Sept. 17, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE MICHAEL REYES et al., Defendants and Appellants.

## COUNSEL

Clifford Douglas, under appointment by the Supreme Court, and Michael S. Bromberg for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Bradley A. Stoutt, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendants Lawrence Michael Reyes and Juan Francisco Venegas were charged by information with the crime of murder in the first degree (Pen. Code, §§ 187, 189). After trial by jury, each was found guilty and sentenced to the term prescribed by law. Upon review of the record, we affirm the judgment as to defendant Reyes, but conclude the evidence is insufficient to support the conviction of defendant Venegas.

Early in the morning of a rainy Christmas Day, 1971, William Staga was murdered in his apartment at 1208 Daisy Avenue in Long Beach. According to D. Joseph Choi of the Los Angeles County Coroner's office, death was caused by one of three separate blows administered to the victim's forehead with a blunt instrument. In addition to the head wounds, the victim suffered multiple lacerations on his wrists, back, lower abdomen, and genitals. Because the lacerations were shallow, uniform in length, and "incise" rather than "defense" wounds, Dr. Choi concluded they were intentionally inflicted while the victim was either unconscious or physically

restrained in such a manner as to prevent him from writhing in response to the pain.

Henry Meade, the manager of the apartments in which the murder occurred, lived in a unit directly across from that of the victim. On the morning of the murder shortly before 7 a.m. he heard unfamiliar voices coming from the victim's apartment. Though unsure, he estimated there were two voices, neither of which he believed to belong to the victim. One of the voices repeated the words "Turn over" twice in a "command-like" tone. Meade dressed and left his apartment to investigate. As he approached the victim's apartment, a man carrying a television set came running out the door. Meade instructed him to return the television, but the man continued advancing and ran into Meade outside the apartment near the street. The television dropped to the ground, and the man escaped past Meade, who had been knocked down onto one knee. Meade arose and went to a nearby fire station for aid, where he described the man to police as a "male Mexican, early 20's, 5'7" to 5'8", medium build, approximately 135 pounds, medium length black hair, wearing a light colored shirt and dark trousers." At trial Meade testified he believed Reyes may have been the man he encountered, but he was certain Venegas was not the man and that the man, unlike Venegas, did not have a beard.

Emily Mallas lived in the apartment building adjacent to the complex where the victim resided. Shortly before 7 a.m. she heard a loud voice say, "Where the hell do you think you're going with that?" and, "Put it down" and, "That's Bill's." She looked out her window, saw "two heads bobbing," and heard the television set crash to the ground. The sound of footsteps followed, and a man ran up the walkway past her window between the two buildings. She described the man as approximately five feet six inches in height, with a dark complexion, dark hair, and no beard. He was wearing a red and white short-sleeve knit shirt and tan pants. Although she identified Venegas at the preliminary hearing as the man who ran past her window, at trial she was positive the man in fact was Reyes.

Marilyn Stoeltje lived in the same apartment building as Emily Mallas. She also went to her window when she heard the confrontation between Meade and the man with the television set. At trial she identified Reyes without question as the man who escaped past Meade outside the victim's apartment.

Melba Penn lived across the street from the victim's apartment. About 6:50 a.m. she left her home to bring in the newspaper and noticed a light blue Plymouth automobile parked on the street across a driveway with its

door open. Upon returning inside her home, she heard the sound of shout-ing and a loud crash of breaking glass. She looked out her window and witnessed what appeared to be an argument between Meade and a young man whose back was turned to her. The young man walked to the Plymouth and placed his hands on the open door. Then, while Meade proceeded to the fire station, the young man disappeared on foot between two buildings. Though able to view the man only from the back and side, she described him at trial as dark complected, with long black hair and either a beard or a scarf, and wearing a brown coat. She was unable to identify Reyes or Venegas, but testified Venegas more closely resembled the man she saw that morning because of his longer hair.

Officer Alvin Vanotterloo arrived at the victim's apartment at 7:12 a.m. Inside a fireman was administering first aid for the victim's head wounds and lacerations. Blood was located on the top rim of the bathtub, which contained several articles of the victim's clothing in a half inch of brownish water. In an alley to the rear of the victim's apartment Officer Vanotterloo found the head of a hammer with part of its wooden handle still intact. On the hammer was discovered blood and a grey fleshy matter similar to the substance exuding from the victim's head wound. The other part of the hammer handle was found about 15 feet from the Plymouth automobile, near the site where the television had fallen to the ground. The automobile, registered in the name of Reyes, revealed no indications of having been stolen or tampered with in any way. Officer Vanotterloo's partner recorded a description of the man Meade confronted and broadcast it over police radio.

John Sanderson, a bartender at the Royal Club Bar at 948 Daisy Avenue, testified Reyes and Venegas were in his bar for approximately 10 or 15 minutes shortly after 7 a.m. He could not be certain of the time because the clocks in his bar were customarily set about 10 minutes fast. While in the bar Venegas ordered two beers and Reyes went briefly to the telephone. On cross-examination Sanderson admitted he was not wearing his prescription lenses that morning and he had only two or three seconds to observe Reyes and Venegas because he was busy with other customers.

Shortly before 7:30 a.m. Officers Borsos and Wagner, who had just left the scene of the crime, were flagged down by Reyes and Venegas near a phone booth on the corner of Tenth Street and Daisy Avenue. Reyes told the officers he had been attempting to call the police to report the theft of his automobile. Officer Borsos recognized Reyes' name as matching the one on the registration of the Plymouth found in front of the victim's apartment and also noted that Reyes fit the description of the suspect

broadcast earlier over the radio. At the request of the officers, Reyes and Venegas entered the police car and were driven back to the victim's apartment for "elimination purposes." After talking with homicide detectives, however, the officers decided against showing the suspects to the witnesses. At the time he was taken into custody, Reyes was wearing a red and white short-sleeved shirt, dark Levi blue jeans, and a hat. Venegas was wearing a light blue shirt, dark blue corduroy pants, and a three-quarter length brown jacket.

Officer Robert Bell accompanied Sergeant Skaggs to Reyes' residence and obtained consent to search from Reyes' wife. Under a pile of dirty clothes Officer Bell found a pair of tan corduroy pants with blood stains on the left pocket and leg. Sergeant Skaggs found a wallet containing the victim's identification but no money.

Reyes' palm print was located on a wall in the victim's apartment, and Reyes had fresh abrasions on his right hand at the time he was arrested. Venegas' left thumb print was taken from the passenger window of the Plymouth, but none of Venegas' finger or palm prints were discovered inside the victim's apartment and there were no blood stains on any of his clothes. When he was arrested Venegas displayed no abrasions or other signs of struggle on his body.

Deborah Routh lived in the apartment building next to that of the victim. On Christmas Eve at approximately 4 p.m. she had a brief conversation with the victim and noticed two men who may have been Reyes and Venegas standing in the victim's doorway with a liquor bottle. Sometime before dawn on the morning of the murder she heard a loud crashing noise followed by a voice she ascribed to a neighbor, Stanford Jones, saying, "Don't hurt Bill anymore, don't hit him anymore." She was unable, however, to identify Jones in the courtroom and admitted she did not recognize him once he was pointed out to her though they had lived in adjacent buildings for a period of years. According to several neighbors the witness had a poor reputation in the community for truth and veracity and was often in a state of intoxication. Sergeant Skaggs had spoken with the witness shortly after the murder and had given little credence at that time to the events she related.

At trial Reyes confessed to the killing and totally exonerated Venegas. His defense was diminished capacity. He testified he was with his wife at a market in Wilmington at 4 p.m. on Christmas Eve and not with Venegas or the victim. About 7:30 p.m. that evening he went to a party at his father's home where he consumed a great deal of alcohol, took two "reds" around 2:30 a.m., and smoked one marijuana cigarette. Between 4 and

6 a.m. he left the party in his father's Plymouth and drove with his wife and Venegas to his home in Long Beach. In front of his residence he noticed a truck with hubcaps which he wanted to steal. He conveyed his desire to Venegas, and together they removed the hubcaps and carried them inside.

Venegas fell asleep in the bedroom of Reyes' child who was away visiting a grandparent. Reyes was unable to sleep and decided to take a walk. He returned after a short while and drove the Plymouth to the apartment of the victim, whom he had met casually on several previous occasions, in order to obtain a drink. The door to the apartment was open and Reyes entered. The victim was lying in bed watching television. Reyes also began to watch television and requested something to drink. The victim responded he had no liquor. He then called to Reyes to "Turn around." When Reyes did so, the victim instructed Reyes to "suck his cock" which the victim was holding exposed in his hand. Reyes "went blank." The next thing he remembered was cutting the victim several times with a knife. He reached for the hammer, discovered its broken handle, and thought, "Well, did I kill him?" He went outside and hurled the head of the hammer, but could not recall what happened to the handle. Reyes returned inside, cleaned the knife, and placed it in a drawer.

Reyes decided to take the victim's wallet because he needed one, the television set for reasons he could not explain, and 12 cents lying in the apartment. He went outside to open the car door, returned to the apartment for the television, and was carrying the set outside when a man approached him. Reyes threw the television at the man, fell, and ran home. When he arrived at his apartment, he washed and changed, put the victim's wallet away, and placed his pants and shirt with other dirty laundry. Realizing he would have to explain why his Plymouth was parked in front of the victim's apartment, he woke Venegas and told him the car had been stolen. Because there was no telephone in Reyes' apartment, the two went to the telephone booth on Daisy Avenue to report the theft. They did not enter the Royal Club Bar across the street. As the operator was ringing the police, a squad car drove by, whereupon Reyes hung up the phone and flagged down the officers.

Venegas' testimony supported that of Reyes in virtually every detail. On Christmas Day he was scheduled to return to his home in Grand Junction, Colorado, following his brief vacation in California where he had visited with relatives and friends. On Christmas Eve he attended a party at the home of Reyes' father. He and Reyes, both of whom had been drinking heavily, left the party with Reyes' wife in the early morning hours and

drove to Reyes' home in Long Beach. After Venegas helped Reyes remove some hubcaps from a nearby truck, they all entered the apartment and Venegas fell asleep in an empty bedroom. Venegas next remembered being wakened by Reyes. Though groggy, he recalled Reyes suggesting they "go to the store and get some beer and report the car stolen." Venegas followed Reyes to a phone booth. They did not enter a bar that morning. As Reyes was placing his call, a police car drove by and Reyes signaled to it. The two men entered the car at the request of the officers and were driven to an apartment building. There Venegas was placed under arrest, but did not understand why. On his way to the police station, Venegas fell asleep in the squad car. He had never in his life met William Staga.

Psychiatrist Kurt Fantl examined Reyes for several hours on June 15, 1972. Reyes related to him a version of events substantially identical to his testimony at trial, which story Dr. Fantl believed to be essentially truthful. Based on a general examination, Reyes' statement, and the consumption of alcohol, barbiturates, and marijuana, the doctor concluded Reyes did not possess the capacity to deliberate or form an intent to kill when he used the knife and hammer. In his opinion Reyes had experienced an uncontrollable rage in response to the victim's homosexual advance and his conduct was an unconscious reaction to an attack on his masculinity.

It was stipulated at trial that Reyes submitted to a Breathalyzer test at the police station at 9:30 a.m. on the morning of the murder which showed a blood alcohol content between .04 and .05 percent. Dr. Stevenson, a physician and chemist, testified that if Reyes' blood dissipated the alcohol at a normal rate, he may have had a blood alcohol content as high as .105 percent at 6:30 that morning. Dr. Stevenson further testified that if Reyes had ingested 200 milligrams of secobarbital at 2:30 a.m. and also had a blood alcohol content of .105 percent, his ability to reflect upon the nature and consequences of his acts would have been substantially impaired.

### Venegas' Appeal

There is merit to Venegas' contention that the evidence adduced at trial is insufficient to support the judgment rendered against him. **(1)** In reviewing a criminal conviction, an "appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; see also *People* v. *Kunkin* (1973) 9 Cal.3d 245, 250 [107 Cal. Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]; *People* v. *Bassett*

(1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777]; *People* v. *Hall* (1964) 62 Cal.2d 104, 109-110 [41 Cal.Rptr. 284, 396 P.2d 700].) The substantial evidence rule is our yardstick for determining whether a verdict meets this minimal standard of reasonableness: "The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt." (*People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; see also *People* v. *Kunkin* (1973) *supra*; *People* v. *Reilly* (1970) *supra*; *People* v. *Redmond* (1969) *supra*.) To be considered substantial, evidence must be of the type which "reasonably inspires confidence and is 'of solid value.'" (*People* v. *Bassett* (1968) *supra*.)

The evidence presented against defendant Venegas lacks substantial probative value. The prosecution's case rests on the theory that both defendants killed the victim in the course of robbing him. Support for the theory of two murderers is alleged to exist in Meade's testimony that he heard voices which he did not recognize coming from the victim's apartment. The words which Meade was able to discern, i.e., "Turn over" uttered in a "command-like" tone, are claimed to corroborate a reasonable conclusion that the voices belonged to robbers who were attempting to extort by means of torture an admission of where valuables could be found. However, the words overheard by Meade closely resemble the phrase attributed to the victim by Reyes before the murder, i.e., "Turn around." The voices, therefore, are as likely to have been those of Reyes and the victim, or may even have emanated from the television set which according to Reyes was operating at the time.

The fact the head of the hammer, the undisputed murder weapon, was found a considerable distance away from the handle lends little strength to the People's supposition that two robbers committed the murder. Reyes could have separately disposed of the two pieces of the hammer, and indeed testified he hurled the hammer head away from the murder scene. Such conduct appears as plausible as the prosecution's conclusion that each robber ran in a different direction after the murder and dropped part of the hammer along the way.

The People also attempt to bolster their theory of two murderers with the coroner's testimony that the victim's body must have been immobile when the knife wounds were inflicted because of the shape and similarity of the lacerations. It is urged the jury could reasonably have inferred that two men restrained the victim while the incisions were made in order to force him to reveal the location of any hidden valuables. However, although Meade was able to overhear voices, no screams of pain were heard by any of the witnesses and no evidence indicated the victim was bound or gagged.

It is manifestly unlikely two men would be able to inflict a series of regular and uniform incisions and at the same time restrain the victim in such a manner as to prevent him from either screaming or writhing in response to the pain. Alternatively, if the victim had been previously hammered unconscious, as Reyes testified and the coroner postulated, the uniform incisions are readily explicable, but support for the theory of two murderers vanishes. Furthermore, the motive of robbery offered by the prosecution does not adequately account for the incisions on the victim's genitals, which suggest a sexual element to the crime consistent with Reyes' confession.

Not only is the prosecution's theory of two murderers supported by affirmative evidence which is tenuous at best, but it is undercut by the undisputed fact that all four witnesses observed the same man leaving the victim's apartment with the television set. Thus, in order to determine there were two murderers, the jury had to reasonably conclude the men left the scene at different times and that one of them went entirely unnoticed by all four witnesses.

Even were we to accept the People's hypothesis that two men entered the victim's apartment for the purpose of committing a robbery, it must also be proved, of course, that Venegas was in fact one of the murderers. The evidence on this point is considerably less substantial than that underlying the general theory of two murderers. The prosecution's entire case against Venegas is founded on the conclusion that it was he and not Reyes whom Meade encountered running from the victim's apartment with the television.

The People rely principally on the testimony of Mrs. Penn to demonstrate the presence of Venegas at the scene of the crime. Mrs. Penn stated the man she saw leaving the victim's apartment wore a brown jacket and either a scarf around his neck or a beard. At the time he was arrested Venegas was bearded and wearing a dark brown coat. However, Mrs. Penn admitted at trial she could not identify Venegas, though he "looked more like" the man she saw because of his longer hair. There is little light at 7 a.m. in late December, especially on a foggy and rainy morning, and Mrs. Penn viewed the incident from across the street approximately 125 feet away. Furthermore, two other witnesses, Mrs. Mallas and Mrs. Stoeltje, positively identified Reyes as the man who fled the victim's apartment with the television, and a third witness, Meade, testified he was certain Venegas was not the man and he suspected Reyes was.

The People suggest Meade's testimony in fact corroborates that of Mrs. Penn inasmuch as Meade stated the man he confronted was wearing dark pants and Reyes' bloodstained trousers were tan. However, Meade and

Mrs. Mallas, both of whom were significantly closer to the scene than Mrs. Penn, testified the man wore a light colored sport shirt and was clean shaven, thus contradicting the main thrust of Mrs. Penn's testimony that the man wore a brown coat and a beard. The light colored sport shirt which Meade and Mrs. Mallas recollected corresponds with the red and white short-sleeved shirt which Reyes was unquestionably wearing when he committed the murder.

In light of the contradictory testimony of three disinterested witnesses, as well as Reyes' voluntary and convincing trial confession which exculpated Venegas, we cannot view Mrs. Penn's inherently insubstantial testimony as sufficient to incriminate Venegas. ■ "Implicit in our duty to determine the legal sufficiency of evidence to sustain a verdict is our obligation, in a proper case, to appraise the sufficiency and effect of admitted or otherwise indubitably established facts as precluding or overcoming, as a matter of law, inconsistent inferences sought to be derived from weak and inconclusive sources." (*People* v. *Holt* (1944) 25 Cal.2d 59, 70 [153 P.2d 21]; see also *People* v. *Bassett* (1968) *supra,* 69 Cal.2d 122, 137; *People* v. *Hall* (1964) *supra,* 62 Cal.2d 104, 110; Jaffe, *Judicial Review: Question of Fact* (1956) 69 Harv.L.Rev. 1020, 1026-1031.) **(2b)** The evidence is overwhelming that it was Reyes who ran from the victim's apartment with the television.

Apart from the testimony of Mrs. Penn, the evidence indicating Venegas participated in the murder is negligible. The fact his fingerprints were found on the window of the Plymouth is offered to support Mrs. Penn's claim that the man she observed leaving the victim's apartment went to the car and placed his hands on the door. But the evidence is clear that Venegas was a passenger in the automobile on the evening before the murder, hence divorcing the fingerprints from any taint of criminality. There is no reason to conclude the prints were made on the morning of the murder and not the previous evening. (See, e.g., *People* v. *Redmond* (1969) *supra,* 71 Cal.2d 745, 756-757.)

The only remaining evidence which links Venegas in any way to the crime is Sanderson's testimony that Reyes and Venegas entered his bar shortly after 7 a.m. on the morning of the murder. Sanderson's testimony was somewhat impeached: he stated he was able to observe the men, whom he had never seen before, for only two or three seconds in a crowded bar and admitted he was not wearing his prescription glasses at the time. Even if believed, however, Sanderson's testimony is far from sufficient to implicate Venegas in the murder. It is undisputed that Reyes went home after the murder to change his bloodstained pants prior to flagging down the

police car shortly before 7:30. If, as Sanderson testified, Reyes entered his bar after 7 a.m. and stayed for 10 or 15 minutes, his trip home to change clothes necessarily occurred before he arrived at the bar, since otherwise there would not have been adequate time for Reyes to go home from the bar several blocks away and return to the phone booth before 7:30. Even if Venegas was seen at the bar with Reyes shortly after the murder this does not compel the conclusion they were together at the scene of the crime. Reyes had ample opportunity to return home after the murder and waken his sleeping friend, as Reyes and Venegas both testified.

In any event, the assertion that Venegas was seen with his codefendant before and after the crime, and thus theoretically could have been a participant, does "no more than generate suspicion which will not support a conviction." (*People* v. *Bamber* (1968) 264 Cal.App.2d 625, 630-633 [70 Cal.Rptr. 662]; see also *People* v. *Blackwell* (1961) 193 Cal.App.2d 420, 424 [14 Cal.Rptr. 224]; *People* v. *Graziano* (1948) 83 Cal.App.2d 701, 705 [189 P.2d 518]; *People* v. *Draper* (1945) 69 Cal.App.2d 781, 785-786 [160 P.2d 80].) Moreover, it is significant that when Venegas was arrested that morning he revealed no physical signs of struggle on his body, unlike Reyes. No bloodstrained clothes belonging to Venegas were found, and none of his fingerprints appeared in the victim's apartment. In short, there is a conspicuous lack of incriminatory evidence which normally would be forthcoming and was produced against Reyes.

When viewed in a light most favorable to the prosecution, the evidence against Venegas at most gives rise to a bare suspicion of his complicity in the murder. ■ As we stated in *Redmond*, "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (71 Cal.2d at p. 755.) "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence." (*People* v. *Hall* (1964) *supra,* 62 Cal.2d 104, 112.) ■ The case against Venegas is so fraught with uncertainty as to preclude a confident determination of guilt beyond a reasonable doubt.

Accordingly, we conclude the judgment as to Venegas must be reversed because the evidence is insufficient as a matter of law to support the verdict.

### Reyes' Appeal

Defendant Reyes' contentions of error were fully considered and correctly resolved by the Court of Appeal. We therefore adopt the relevant

portion of the opinion of the Court of Appeal prepared by Justice Ashby as and for the opinion of this court. The opinion is as follows:*

■ *Search of Reyes' home.* Appellant Reyes contends that the court erred in denying his motion under Penal Code section 1538.5, because Mrs. Reyes' consent to the search of her home was not adequately shown to be voluntary. He argues that she thought she had to permit the officers to search the residence. ■ The question of whether consent is voluntary or in submission to an express or implied assertion of authority is a question of fact to be decided by the trier of fact in light of all the circumstances and the trial court's resolution of conflicts in the evidence and credibility of witnesses will not be disturbed on appeal if there is substantial evidence to support it. (*People* v. *West,* 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409]; *People* v. *Gravatt,* 22 Cal.App.3d 133, 137 [99 Cal. Rptr. 287].) ■ Officer Skaggs testified that he asked Mrs. Reyes if they could search the house and she said that they could. He testified that he utilized no threats, force, or inducements to obtain her consent. Mrs. Reyes told him to look anywhere he wished. After finding the pants and wallet, Skaggs asked if she had any objection to a continuation of the search and she said they could continue searching. The officer was not required to warn Mrs. Reyes that she was entitled to refuse consent. (*People* v. *Gravatt, supra*; *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227 [36 L.Ed.2d 854, 862-863, 93 S.Ct. 2041].) The wife of a suspect may consent to a search of the residence. (*People* v. *Carter,* 48 Cal.2d 737, 746 [312 P.2d 665]; *People* v. *Bryan,* 254 Cal.App.2d 231, 234 [62 Cal.Rptr. 137], cert. den., 390 U.S. 1044 [20 L.Ed.2d 305, 88 S.Ct. 1642].) The record supports the trial court's ruling. [ ]

■ *Routh testimony.* [ ] [Reyes contends] that the testimony of Deborah Routh should have been suppressed because the police did not reveal her name and address to the defense pursuant to an order of the court on their motion for discovery. Shortly after the commencement of trial Mrs. Routh was interviewed by the police and the prosecutor gave the defense a copy of the police report of that interview on June 21, 1972. It was learned, however, that the police had previously talked to Mrs. Routh on December 25, 1971, the day the crime occurred. Officer Skaggs testified that he had interviewed Mrs. Routh and taken her name, address, and

---

*Brackets together, in this manner [ ] without enclosing material, are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases cited.)

a partial statement but that his notes were never incorporated into a formal police report. He believed that his notes were in the file which he showed to appellant Reyes' attorney, Mr. Dib, although he could not positively state that they were in the file. Mr. Dib, however, testified that when he examined the file he did not see the report. [ ] The trial court found that failure of the police to comply with the order and to disclose the name and address of the witness interviewed was inadvertent, unintentional, and without negligence. It further found that the failure did not sufficiently prejudice [ ] appellant such as to justify excluding Mrs. Routh's testimony or granting a mistrial. The trial court's ruling was correct.

In *People* v. *McRae,* 256 Cal.App.2d 95, 104 [63 Cal.Rptr. 854], the court said: "[I]f the truth is to be served, the failure to disclose, at least where not wilful, should not be punished by the suppression of evidence, but by giving the offended party a proper opportunity to meet the new evidence. . . ." (See also *People* v. *Young,* 224 Cal.App.2d 420, 423 [36 Cal.Rptr. 672].) Here the trial court offered [ ] [Reyes] a continuance in order [ ] to prepare to meet Mrs. Routh's testimony. This was the proper procedure.

[ ] [Reyes fails] to show that failure of the police to comply with the discovery order earlier resulted in prejudice which could not be cured by the granting of a continuance. The burden is on [ ] [the appellant] to establish prejudice on the failure to comply with a discovery order. ([*People* v. *Morris,* 226 Cal.App.3d 12, 16 [37 Cal.Rptr. 741]]; *People* v. *Wilson,* 222 Cal.App.2d 616, 617-618 [36 Cal.Rptr. 280].) [ ] [The] argument that [ ] [Reyes] might have discovered helpful evidence had [ ] [he] learned about Mrs. Routh earlier is highly speculative. The continuance granted [ ] by the court offered [ ] [Reyes] adequate opportunity to meet Mrs. Routh's testimony. [ ]

■ *Victim's psychiatric records.* Appellant Reyes contends that the court erred in excluding evidence that 20 years earlier the victim, Mr. Staga, was diagnosed by a psychiatrist and that the psychiatrist's diagnostic impression was "Alcoholism with sexual psychopathy. This patient is not an outstanding patient for psychiatric treatment." This diagnosis was contained in a psychiatric report which appellant contends was admissible as a hospital business record under Evidence Code section 1271. The trial court held that it was not, and precluded appellant from introducing the report into evidence and from examining Dr. Fantl as to the use he made of the report when he examined Reyes.

Apparently appellant's position is that the diagnosis that Staga had a sexual psychopathology was relevant to support Reyes' version that Staga made a homosexual advance to him. The inference that because 20 years

ago the victim was diagnosed as having a sexual psychopathology he therefore committed a specific homosexual advance on the night in question was, of course, a very weak one, and the trial court was legitimately concerned with the remoteness of the evidence. Moreover the trial court properly ruled that the report did not satisfy the requirements of Evidence Code section 1271 that the record be "of an act, condition or event." The psychiatrist's opinion that the victim suffered from a sexual psychopathology was merely an opinion, not an act, condition or event within the meaning of the statute. " '. . . In order for a record to be competent evidence under that section it must be a record of an act, condition or event; a conclusion is neither an act, condition or event; it may or may not be based upon conditions, acts or events observed by the person drawing the conclusion; it may or may not be founded upon sound reason; the person who has formed the conclusion recorded may or may not be qualified to form it and testify to it. Whether the conclusion is based upon observation of an act, condition or event or upon sound reason or whether the person forming it is qualified to form it and testify to it can only be established by the examination of that party under oath. . . . It is true that some diagnoses are a statement of a fact or condition, for example, a diagnosis that a man has suffered a compound fracture of the femur is a record of what the person making the diagnosis has seen but this is not true where the diagnosis is but the reasoning of the person making it arrived at from the consideration of many different factors.' " (*People* v. *Williams,* 187 Cal.App. 2d 355, 365 [9 Cal.Rptr. 722], quoting *People* v. *Terrell,* 138 Cal.App.2d 35, 57 [291 P.2d 155]; see also *Hutton* v. *Brookside Hospital,* 213 Cal. App.2d 350, 355 [28 Cal.Rptr. 774, 29 Cal.Rptr. 670].) A psychiatric diagnosis is especially susceptible to the reasoning of *Williams* because it is based upon the thought process of the psychiatrist expressing the conclusion. The People had no opportunity to cross-examine the psychiatrist who made the 20-year-old diagnosis to determine what factors led him to his conclusion and whether he was qualified to make it.

Appellant contends, however, that the records were admissible at least for the limited purpose of showing that they constituted one basis for Dr. Fantl's opinion as to Reyes' mental condition. (See *Springer* v. *Reimers,* 4 Cal.App.3d 325, 338-339 [84 Cal.Rptr. 486].) This contention is unsupported under the facts of the instant case. Dr. Fantl was extensively examined on *voir dire* to determine to what extent, if any, he relied upon the report in forming his opinion, and the trial court properly concluded that Dr. Fantl's conclusion was not based upon it and therefore no inquiry should be made of it in front of the jury. It made little, if any, difference to Dr. Fantl that the victim had a record of sexual problems. The only thing the report did for Dr. Fantl was to make him slightly more strongly

believe that Reyes was telling him the truth in their interview. The report concerning the victim's 20-year-old diagnosis thus played an insignificant role in Dr. Fantl's conclusion, and the trial court properly ruled that the report was an extraneous issue which should not be delved into.

█ *Instructions.* Appellant Reyes contends that the court erred in giving CALJIC instruction No. 4.30 without amplifying the meaning of the term "sound mind" as used in that instruction.[1] This contention is wholly without merit. The instruction was requested by appellant Reyes himself. He ought not to be heard to urge for the first time on appeal that his own requested instruction required further amplification. (See *People* v. *James,* 274 Cal.App.2d 608, 611 [79 Cal.Rptr. 182].) Even on its merits, however, appellant's argument is erroneous. Essentially he argues that he was entitled to an instruction that unconsciousness is a complete defense to the crime. Such is not the case, however, when unconsciousness is due to voluntary intoxication. Voluntary intoxication is not a complete defense to homicide. (Pen. Code, § 22; *People* v. *Graham,* 71 Cal.2d 303, 316-317 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Alexander,* 182 Cal.App.2d 281, 289-292 [6 Cal.Rptr. 153].) Even had the jury believed that Reyes was unconscious at the time of the killing, there was no evidence that the unconsciousness resulted from other factors excluding his voluntary use of liquor, "reds," and marijuana the morning of the homicide. (*People* v. *Alexander, supra.*) The trial court properly instructed the jury, in accordance with *Graham, supra,* that if the defendant killed while unconscious as a result of voluntary intoxication and was therefore unable to form a specific intent to kill or to harbor malice, his killing is involuntary manslaughter. Reyes was not entitled to the instruction he seeks.

█ *Sufficiency of evidence.* Appellant Reyes contends that the evidence is insufficient to support his conviction of first degree murder. He argues that the prosecution failed to show that he had the capacity either to premeditate the killing or to form the specific intent to rob, such as to support a first degree murder verdict based on the felony-murder rule. We disagree. That the victim's television set was being taken from his apartment when Mr. Meade interrupted the [murderer], and the fact that the victim's wallet was discovered in Reyes' apartment was circumstantial evidence that [ ] [he] intended to take these items by force and fear from the

---

[1]As modified by the court the instruction read:

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of law applies only to cases of the unconsciousness of persons of sound mind, such as the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind."

victim at the time of the killing. (*People* v. *Cavanaugh,* 44 Cal.2d 252, 266 [282 P.2d 53], cert. den. 350 U.S. 950 [100 L.Ed. 828, 76 S.Ct. 325]; *People* v. *Watters,* 246 Cal.App.2d 154, 157 [54 Cal.Rptr. 494]; *People* v. *Baglin,* 271 Cal.App.2d 411, 417 [76 Cal.Rptr. 863].) [ ] Reyes admitted that just a few hours before going to the victim's house he had stolen some hubcaps from a parked truck near his home because he wanted the hubcaps. Reyes' defense expert, Dr. Fantl, admitted that at the time Reyes stole the hubcaps and took the wallet and television set he may have had the capacity to intend to commit theft or robbery. Dr. Fantl's testimony that at the time of the killing appellant Reyes lacked the capacity to commit murder was based largely on the version of events as related to Dr. Fantl by Reyes, which the doctor believed. The jury did not believe Reyes, however, and was entitled to reject the expert evidence based on Reyes' story. [ ]

██ *Prosecutor misconduct.* [ ] [Reyes alleges] a number of examples of prejudicial misconduct on the part of the prosecutor. We have examined each of these instances and find that none of them constitutes prejudicial misconduct.

Several of the contentions concern attacks made by the prosecutor on appellants in his argument to the jury. It is complained that the prosecutor referred to Reyes' testimony as a "monstrous lie" and "garbage," called appellants "cocky" and said that Venegas had "ice running through his veins." No objection was raised to these comments at the time they were made or request made for an admonishment to the jury and therefore these examples may not be urged as misconduct for the first time on appeal. (*People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].) Moreover where the prosecution evidence points to guilt and is inconsistent with the defense it is not misconduct to argue that the witness lied. (*People* v. *Garrison,* 246 Cal.App.2d 343, 352-354 [54 Cal.Rptr. 731].) Use of language such as "ice running through his veins" is not improper where justified by the brutality of the murder. (*People* v. *Wein,* 50 Cal.2d 383, 397 [326 P.2d 457].) Objection was made at trial to a statement by the prosecutor that ". . . because the physical evidence becomes so compelling that when you put two and two together, the man is up there lying. He knows what the case is. 'Forget all the prosecution's evidence beforehand. The victim having that conviction and all these things—.' " The statement is ambiguous and does not clearly amount to a charge that the defense knew the prosecution evidence before trial.

██ [ ] [Appellant also complains] of remarks the prosecutor made about defense counsel when he argued that counsel for Reyes was "a frustrated psychiatrist" and had a "smirk on his face" during examination of one

witness, and that one of the counsel referred to Officer Smith "as being no better than the ordinary dopey on the street." Of course, it was the defendants and not the defense counsel who were on trial, and name calling of opposing counsel should be avoided. But the prosecutor himself emphasized this to the jury shortly thereafter in his argument when he said, "The attorneys, even though they may be friends otherwise, as advocates in the courtroom, certain things may happen. The point I am trying to make is the mere fact that we refer to each other as names, we are not on trial." Clearly these comments did not contribute to the verdict. (*People v. Perry*, 7 Cal.3d 756, 790-791 [103 Cal.Rptr. 161, 499 P.2d 129].) [ ]

■■■■ *Exhibits in jury room.* [ ] [Reyes argues] that the court erred in failing to grant a mistrial or new trial on the ground that the jury was prejudiced by the fact that certain items excluded from evidence were by mistake left in the jury room during jury deliberations. The problem was People's Exhibit 38, the clothing of the victim, including his trousers, shirt, jacket, underwear, and a towel. Some of these items were thoroughly soaked in blood and had an odor. [ ] [Reyes] objected to the introduction of the evidence on the ground that it was inflammatory and prejudicial. The court overruled the objection but the prosecutor decided that he would seek introduction only of the victim's trousers, which were the least objectionable of the items. The trousers were marked Exhibit 38-A, and the other items 38-B. Exhibit 38-A was then introduced into evidence without objection and 38-B was not introduced. However, all of Exhibit 38 was inadvertently sent into the jury room for the jury's deliberations. The court denied [ ] [Reyes'] motion for mistrial, without prejudice to raising the issue of a motion for new trial. Before ruling on the matter again on the motion for new trial, the court and counsel in chambers examined each of the jurors individually to determine if the presence of the excluded evidence in the jury room affected the jury's verdict.[2] After examination of the jurors, the court was satisfied beyond a reasonable doubt that the jury would have reached the same verdict had the items not been in the jury room and that the presence of the evidence played no part whatsoever in the jury's verdict. The court was amply justified in so ruling.

[2We note parenthetically that such a procedure is explicitly disapproved by Evidence Code section 1150, subdivision (a), which states: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or to dissent from the verdict or concerning the mental processes by which it was determined."* (Italics added.) It is clear from the record, however, defense counsel consented to the *voir dire* and accordingly waived any objection thereto.]

In the first place, the court was never convinced that the clothing was by its nature inflammatory and prejudicial. The court had originally ruled that the evidence was admissible but the prosecution voluntarily withheld introduction of all but the trousers. Moreover the examination of the jurors revealed that Exhibit 38 did not affect their verdicts. Although many of the jurors noticed the exhibit and wondered what it was, there was no discussion of it by the jury. Each of the jurors testified that Exhibit 38 was not considered by him or that it did not affect his verdict. [ ] [Reyes asserts] that jurors Burdette and Gann stated that the exhibit did contribute to their verdicts, but these statements must be taken in the context of their entire testimony. Originally when asked whether the exhibit affected his verdict, juror Burdette replied: "Well, yes. I knew there was enough blood there—that's about all I can say." However, upon examination he disclosed that he had only peeked at the items, did not smell them, and did not take a closer look at them or pick them up. He testified that the clothing did not in any way contribute to his decision, and he set forth the evidence which he did take into consideration. Although when originally asked whether the clothing affected her verdict, Mrs. Gann replied, "Well, I think it did. It showed how bad he was hurt," and that "I do think seeing his jacket and that bloody towel and his trousers made me think that—a little bit more that they was [sic] guilty, you know," she only meant that the clothing showed how badly the victim had bled and that [ ] [it was] unmerciful to let him bleed like that. Mrs. Gann knew that the issue was still "to find out if actually Venegas and Reyes was [sic] actually there." She unequivocally testified that on the basis of the other evidence she believed Reyes [ ] [was] there and [ ] [was] guilty. The court was quite justified in finding that the clothing did not contribute to the verdicts of any of the jurors.

[ ] [Reyes also contends] that in its introductory remarks prior to examining each juror the court subtly suggested to the jurors that they should state that the clothing did not affect their verdict. This is without merit. The court earnestly admonished the jurors to ignore any tendency they might feel to support the verdict and to be completely candid in their testimony. Mrs. Gann's statement that the jury foreman told her not to say that the exhibit affected the decision was denied by the foreman and other jurors. [ ]

[The judgment as to Reyes is affirmed and the judgment as to Venegas is reversed.]

Wright, C. J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**CLARK, J.**—I concur in affirming the judgment as to Reyes, but dissent from reversing the judgment as to Venegas.

An appellate justice normally does not hesitate to apply the substantial evidence rule when he personally believes the defendant is guilty beyond a reasonable doubt. However, as agonizing as the responsibility may be, the justice must also follow the rule even when he personally doubts the defendant's guilt.[1] In the latter case, the justice's understandable horror of affirming the conviction of a possibly innocent man—reinforced by the human conceit that reasonable men would necessarily share his doubt—may lead him unconsciously to minimize the substantiality of the evidence supporting the conviction.

The majority's perception of the evidence against Venegas appears to have become distorted in this manner. Despite the majority's evident concern that he may actually be innocent, the jury's conclusion that Venegas was one of two murderers is clearly supported by substantial evidence.

Henry Meade's testimony that he heard two unfamiliar voices coming from the victim's apartment shortly before the murder is itself substantial evidence that Reyes did not commit the crime alone.[2] Dismissing Mr. Meade's testimony, the majority speculates that the two voices "are as likely to have been those of Reyes and the victim, or may even have emanated from the television set . . . ." (*Ante,* p. 497.) However, the jury's rejection of these alternative explanations is supported by substantial evidence. Mr. Meade's apartment was only 10 feet across a

---

[1] An appellate court must view the evidence in the light most favorable to the respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment. The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. (*People v. Williams* (1971) 5 Cal.3d 211, 214 [95 Cal.Rptr. 530, 485 P.2d 1146]; *People v. Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *People v. Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) "After the jury, and the trial judge ruling on a motion for new trial, have found defendant guilty, the presumption of innocence in the trial court is replaced by the presumption in favor of the judgment. A reversal can be ordered only if upon no rational hypothesis is there substantial evidence to support the judgment." (*People v. Miller* (1969) 71 Cal.2d 459, 474 [78 Cal.Rptr. 449, 455 P.2d 377]; see *People v. Bard* (1968) 70 Cal.2d 3, 4-5 [73 Cal.Rptr. 547, 447 P.2d 939]; *People v. Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)

[2] Substantial evidence is "evidence that reasonably inspires confidence and is 'of solid value.'" (*People v. Kunkin* (1973) 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199]; *People v. Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].)

courtyard from the victim's, and both windows in the victim's apartment were open. The victim had a distinctively loud voice. As manager of the apartment building in which the victim resided, Mr. Meade had encountered him almost every day for three years, becoming quite familiar with his voice. Mr. Meade was also familiar with the distinctive sound of the victim's television set, which was "faint, old, and weak." Mr. Meade testified the voices he heard did not sound as if they came from that set.

Moreover, there is substantial evidence that both Venegas and Reyes were observed fleeing the scene of the crime. Mrs. Penn's testimony indicates the man she observed apparently arguing with Mr. Meade was Venegas. She described the man as wearing a brown jacket and a scarf or a beard. When arrested, Venegas was wearing a brown jacket and a beard. Dismissing Mrs. Penn's testimony as "inherently insubstantial," the majority asserts that it is overcome "as a matter of law" by the contradictory testimony of three "disinterested" witnesses (Mr. Meade, Mrs. Mallas and Mrs. Stoeltje), which "indubitably established" that the man was Reyes, that he was wearing a red and white short-sleeve shirt and tan trousers, and that he was clean shaven. (*Ante,* pp. 498-499.)

Aside from the fact that she was apparently somewhat farther away, the only reason given by the majority for characterizing Mrs. Penn's testimony as "inherently insubstantial" is that "[t]here is little light at 7 a.m. in late December, especially on a foggy and rainy morning, . . ." (*Ante,* p. 498.) Although the majority seems determined to view this case in the light most favorable to appellant Venegas—rather than respondent—there was no more light on that foggy, rainy late December morning for witnesses favorable to Venegas than for Mrs. Penn. Nor is there any indication in the record that she was less "disinterested" than they.

The jury was reasonably entitled to resolve the apparent inconsistencies in the descriptions given by Mrs. Penn (brown jacket; scarf or beard) and Mrs. Mallas (red and white short-sleeve shirt; clean-shaven) by concluding that Mrs. Penn saw Venegas and that Mrs. Mallas saw Reyes. Mrs. Mallas' description, unlike Mrs. Penn's, was not based on observation of the confrontation between Mr. Meade and the suspect carrying the television set. Mrs. Mallas simply saw "two heads bobbing," lost sight of them, heard a crash, and seconds later saw the man she described run past her window.

At trial, Mrs. Stoeltje positively identified Reyes as the man Meade confronted, but the jury was reasonably entitled to reject her identification testimony for a reason the majority fails to disclose: Mrs. Stoeltje was legally blind in one eye when the crime was committed and the same

optic nerve disease was affecting the vision in her other eye when she testified six months later. When police brought defendants back to the scene Mrs. Stoeltje said she had never before seen either of them.

Mr. Meade testified that the man he confronted was wearing a "light" shirt, but added that the suspect may also have been wearing a jacket because his torso was obscured by the television set he was carrying. The suspect's trousers were described by Mrs. Mallas as "light tan," but Mr. Meade described them as "dark," as were the trousers Venegas was wearing when apprehended.

Moreover, the People may rely on circumstantial evidence to connect the defendant with the commission of the crime and to establish beyond a reasonable doubt that he committed it. (*People* v. *Bynum* (1971) 4 Cal.3d 589, 599 [94 Cal.Rptr. 241, 483 P.2d 1193]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 424 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].) The circumstantial evidence that Venegas was the other murderer is sufficiently substantial to support his conviction.

Mrs. Routh testified she saw Venegas and Reyes standing in the open doorway of the victim's apartment the previous afternoon. But the majority dismisses Mrs. Routh's testimony by pointing out that her credibility was impeached. (*Ante,* p. 494.) Again, evaluating Mrs. Routh's credibility was within the exclusive province of the jury, and this court may not invade the jury's province unless her testimony was "inherently improbable." (*People* v. *Pearson* (1969) 70 Cal.2d 218, 221 [74 Cal.Rptr. 281, 449 P.2d 217]; *People* v. *Lyons* (1956) 47 Cal.2d 311, 320 [303 P.2d 329].) For statements to be inherently improbable, "there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." (*People* v. *Pearson, supra; People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].) Mrs. Routh's testimony was obviously not inherently improbable. Therefore, the jury was not only entitled to rely on it, but also to infer that defendants were lying when they contradicted her at trial. This inference is as damaging to Venegas as the testimony itself, because the most persuasive aspect of Venegas' defense was Reyes' attempted exoneration of him.

Substantial evidence places defendants together hours before and minutes after the crime, which occurred shortly before 7 a.m. Reyes testified he left his father's party with Venegas between 4 and 6 a.m. Venegas told a police officer he returned from the party with Reyes about 5:30 a.m. They were apprehended a couple of blocks from the murder scene at 7:30 a.m.

Moreover, a half hour earlier they were in a bar in the same vicinity for 15 minutes. But the majority dismisses bartender Sanderson's testimony by commenting that it "was somewhat impeached: he stated he was able to observe the men, whom he had never seen before, for only two or three seconds in a crowded bar and admitted he was not wearing his prescription glasses at the time." (*Ante,* p. 499.) Once again the majority seems to have unconsciously minimized the substantiality of the People's evidence. The bar was not "crowded." There were 10-15 people in it and it was variously estimated as being 100 feet to 1 block long. Admittedly, Sanderson was not wearing his "prescription" glasses, but the record does not indicate the prescription was to remedy nearsightedness. Sanderson testified he did not require the glasses all the time, that he only wore them when his eyes bothered him. There is no indication in the record that Sanderson required his glasses to distinguish the features of men directly across the counter from him. Nor is there any indication in the record that Sanderson's vision was as impaired as Mrs. Stoeltje's, or that his opportunity for observation was as fleeting as Mrs. Mallas'. Sanderson observed defendants well enough to recall that Venegas ordered two draft beers, that Reyes then went to the telephone and turned his back on Sanderson, and that they paid with the correct change. Here, too, the inference Sanderson's testimony permitted the jury to draw concerning Reyes' credibility—that Reyes was lying to protect Venegas when he denied they were in the bar—was as damaging to Venegas' defense as the testimony itself.

The substantial evidence rule is the most fundamental principle of appellate review. Its meaning must ultimately be found in the cases applying it. The majority alters its meaning today.

McComb, J., concurred.