[Crim. No. 27353. Second Dist., Div. Two. Feb. 24, 1976.]

In re EUGENE M., a Person Coming Under the Juvenile Court Law.
CLARENCE E. CABELL, as Acting Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
EUGENE M., Defendant and Appellant.

COUNSEL

Lawrence H. Beylen, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Kathleen M. Crain, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**FLEMING, J.**—*The Murder.* At 9:30 on the night of 30 June 1974 in the yard of a house in Venice, California, Victoriano Munoz and Pedro Gomez were accosted by three Negroes attempting to rob them. As Gomez fled, he saw one of the three shoot Munoz with a short rifle, and he heard a bullet buzz by his ear. Neither then nor later could he identify any of the three robbers. Four days after the shooting Munoz died as the result of a gunshot wound in the chest.

*The Interrogation.* On 3 October 1974 Hadley Hamm, age 16, was summoned to the Venice police station and questioned by Officers Smith and Machuszek about a shooting in June. He told them he knew nothing about it except what he had heard on the street. The officers told Hamm they knew he was present at the shooting, together with Danny Banks, Leo Young, and Eugene M. [appellant EM], but they understood he did not have a gun. Hamm again denied knowledge of the shooting and the following taperecorded conversation occurred:

"[Officer Smith] Please don't lie to me now. . . . We have to put you in jail and let you sit there a few days . . . We'd book you on homicide, murder and you won't get released. We're trying to be fair but we think you're telling us a story and we're not going to buy it . . .

[Hamm] I ain't telling you no story.

. . . . . . . . . . . . . . . . . . . .

[Smith] Hadley, you could be a lot of help to us, but you're kind of telling us stories. I don't know, I guess we're going to have to book him . . .

[Hamm] What you're going to book me for?

[Smith] Attempt murder.

[Hamm] Murder?

[Smith] Yep. Unless you get, get straight here, we're going to try—to be fair to you, but we want the truth so we're not going to stand for your damn lies . . .

[Smith apparently leaves the room]

[Sgt. Machuszek] Let me tell you, Hadley. If he goes out and talks to the man and he says to book you, we're going to book you. And now is the time you can talk about it. Did Danny ask you to go over there with him?

[Hamm] Hey, man. I was over there, man. I'm going to tell you, man.

[Machuszek] All right, what went down?"

Hamm then described an incident that started with six Mexicans in an automobile. A group of persons, including Hamm, Banks, Young, and EM, were talking about robbing the Mexicans. Banks and Young, who had a .22 rifle and a sawed-off shotgun stashed in a yard nearby, asked Hamm to go with them. Hamm refused. The others chased the Mexicans down an alley and robbed one of them. Hamm heard three or four shots so he ran the other way. Running with him were Banks, Young, and EM.

Officer Smith then returned to the interrogation room. Sgt. Machuszek recounted Hamm's story and reported he had been cooperative.

Smith said Hamm's claim that he was not present with the others did not fit. Hamm then told the officers he had been 10 or 15 feet away when Banks and Young demanded the Mexican's money and EM was about to search him. When the Mexican tried to escape over a fence Banks and Young shot him. Smith diagramed a house surrounded by a fence and asked Hamm to mark where each person had stood. Hamm placed Banks, Young, and EM inside the fence with the Mexican who was shot, he put the other Mexican a short distance away, and he put himself outside the fence. The next day Banks told Hamm they got no money, and "he blew him away"; EM later told Hamm, "Man, it was fucked up."

*The Charge.* Following Hamm's interrogation EM, a minor, was detained by the juvenile court, and a petition filed for his adjudication as a delinquent for the murder of Munoz, assault with a deadly weapon on Gomez, and attempted robbery.

*The Trial.* Hadley Hamm, called as a witness before the juvenile court, refused to answer questions on the ground that his answers might incriminate him. After being granted immunity and ordered to answer

pursuant to the provisions of Penal Code section 1324, he gave the following testimony:

"Q On June 30th at approximately 9:30 p.m. were you at the vicinity of 6th and San Juan in Venice?

A No.

Q Did you see a man shot at 621 San Juan in the City of Venice on June 30th, 1974?

A No.

. . . . . . . . . . . . . . . . . . .

Q On the evening of June 30th, 1974, did you hear any shots being fired?

A No.

. . . . . . . . . . . . . . . . . . .

Q On June 30th, 1974, did you see Leo Young with a shotgun?

A No.

Q Did you see Danny Banks with a .22 rifle?

A No.

Q Were you standing approximately 10 to 15 feet away from a shooting on the evening of June 30th, 1974?

A No.

. . . . . . . . . . . . . . . . . . .

Q Did you see [EM] check a Mexican on the evening of June 30th, 1974, approximately 9:30 p.m.?

A No.

. . . . . . . . . . . . . . . . . . .

Q After the incident of June 30th, 1974, did you ever have a conversation with [EM] regarding that particular shooting?

A No.

Q Did [EM] say to you that it was fucked up?

A No."

The witness was then asked whether he had told a different story to Officers Smith and Machuszek, and he admitted he had and identified the answers on the taperecording as his. But everything he had told the police was untrue. He told them a story because they asked him to and because they threatened to charge him with murder one if he did not cooperate.

Officer Smith testified that Hamm volunteered his statements, that Hamm's description of the crime more closely fitted the physical evidence than the description Smith possessed before he started his questioning. In Smith's opinion Hamm had been describing two separate crimes during his interrogation, but the accuracy of the diagram convinced Smith that the second portion of Hamm's statements referred to the Munoz murder.

EM testified he knew nothing about the Munoz murder, that he had been playing dominoes with his brother and Young at the time of the shooting. EM's brother and sister corroborated his alibi. Nevertheless, taken as a whole, the alibi evidence appeared weak and unimpressive.

*The Judgment.* At the conclusion of the trial the juvenile court sustained the petition that EM had committed murder (Pen. Code, § 187), assault with a deadly weapon (Pen. Code, § 245, subd. (a)), and attempted robbery (Pen. Code, §§ 664, 211), and declared him a ward of the court (Welf. & Inst. Code, § 602). EM has appealed.

I

In recent years courts in criminal causes have largely focused on procedural issues involving the exclusion of evidence for extraneous considerations of policy. It would be ironic if this procedural preoccupation, designed to strengthen an accused's legal rights at the cost of acquitting some of those who are factually guilty, caused the courts to

lose sight of the primary objective of evidentiary rules, which is to protect those who may be factually innocent by requiring credible probative evidence of guilt. At bench, the key issue is the sufficiency of the evidence to prove the charges.

We may quickly dispose of the procedural issues in respondent's favor. (1) The formal requirement for corroboration of accomplice testimony for a criminal conviction (Pen. Code, § 1111), does not apply to a juvenile proceeding. Accomplice corroboration is a rule of historical and statutory importance and not a tenet of constitutional law. (*In re R. C.,* 39 Cal.App.3d 887, 892-897 [114 Cal.Rptr. 735]; *In re D. L.,* 46 Cal.App.3d 65, 73 [120 Cal.Rptr. 276].) (2) Appellant lacked standing to suppress evidence of Hamm's interrogation at the police station on the asserted ground that Hamm had not been fully advised of his right to counsel. (*People* v. *Varnum,* 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772].) (3) The police interrogation of Hamm did not involve physical or psychological coercion of the type and magnitude required to make his statements as a witness involuntary and inadmissible. (*People* v. *Underwood,* 61 Cal.2d 113, 124-125 [37 Cal.Rptr. 313, 389 P.2d 937].) Hamm was not under arrest during his interrogation, and he retained full possession of his faculties. On each of the foregoing issues the trial court's rulings were correct.

II

Yet rulings in favor of the admissibility of evidence and its formal sufficiency as proof do not establish its value as proof of fact. At bench, the entire evidence to prove that EM participated in the murder of Munoz consisted of: (1) Gomez's testimony that three unidentified Negroes shot at him and killed Munoz; (2) counsel's concession that EM is a Negro; (3) Hamm's testimony denying any knowledge that EM participated in the murder but admitting that in an earlier unsworn statement he told police that EM had participated in the murder.

The circumstances surrounding Hamm's unsworn statements suggest their inherent untrustworthiness. (1) The tape recording of the interrogation reveals threats of incarceration and prosecution unless the witness made the statements suggested to him. (See *People* v. *Haydel,* 12 Cal.3d 190, 198 [115 Cal.Rptr. 394, 524 P.2d 866]; *People* v. *Boles,* 221 Cal.App.2d 455, 458 [34 Cal.Rptr. 528].) (2) Hamm testified under oath his statements were untrue and that he had given them to satisfy the police, who were threatening to charge him with murder. (3) Hamm's

narrative of the Munoz murder was apparently confused and intermingled with the narrative of another crime against Mexicans which occurred at about the same time and place. If Hamm's unsworn statements were disregarded we would have no evidence whatever to connect EM with the murder. What weight, then, do we give these statements?

At the outset we can assume that in conducting our daily affairs and providing for our personal protection, we would act as though the three accused persons were the killers of Munoz. We also concede to the police the right to make the same assumption and to conduct their investigation on the hypothesis that these three persons were the actual killers. But well-grounded suspicion is not proof, and especially is it not proof beyond a reasonable doubt. In juvenile proceedings where crime is charged, proof of guilt must satisfy the standard required for criminal prosecutions—proof of guilt beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; Welf. & Inst. Code, § 701.) Under the evidence here presented it could plausibly be assumed that Hamm himself was one of the killers; that Hamm and unidentified third persons were the killers; that none, or one, or two, or three of the persons accused by Hamm were the killers. Evidence of such imprecision does not establish even a probability of guilt, much less guilt beyond a reasonable doubt. Proof of guilt requires evidence that is solid and credible. Evidence is matter that makes clear the truth of fact (Blackstone), persuades a court of the existence of fact (Bentham), or produces a just conviction of truth (Livingston). (Wigmore on Evidence (3d ed. 1940) § 1.) The matter at bench does none of these things. Viewed as evidence, the unsworn accusation amounts to little more than a valuable lead for further investigation, a lead that might have been exploited to obtain probative evidence, but apparently was not. As far as we know, Hamm was never required to repeat his story under oath, the murder weapons were never located, and fortifying statements from other participants or witnesses to the murder were never secured. The unsworn accusation stood alone, unsupported by corroborating evidence or by distinctive detail that would lend it verisimilitude. Its value as proof is correspondingly low.

To make up these deficiencies in proof respondent relies on the rule set out in Evidence Code section 1235 and upheld in *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]. That rule permits the introduction in evidence of prior inconsistent statements as proof of the matters stated. But in *Green,* as in the usual case of its sort, some of the prior inconsistent statements were made in court under oath. Additional-

ly, such statements usually comprise only part of a broader mosaic of proof. A typical example of the use of repudiated statements is the prosecution of a father for incest with his daughter, where both mother and daughter have previously testified about the commission of the crime but have repudiated their testimony at trial. (Cf. *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111].) If evidence of the crime is solidly based, the repudiated testimony will sustain a conviction. (*People* v. *Green,* 3 Cal.3d 981, 991 [92 Cal.Rptr. 494, 479 P.2d 998].) *Green* tells us that such evidence is admissible, but not that it is necessarily believable. At bench none of the indicia of reliability for such evidence is present. Rather the cause more nearly resembles the discredited practice of rubbing red pepper in the eyes of a witness in order to secure an accusation desired by the police (1 Stephen, History of the Criminal Law of England (1883) p. 442). While this is an easy way to acquire evidence, a badgered witness, as experienced counsel know, usually does not stay put but either recants or equivocates.

To bolster its case, respondent cites various inconsistencies in Hamm's testimony and in the alibi testimony of EM and his siblings. These negatives cannot establish the required positive case or substitute for probative evidence of EM's participation in the crime. Hamm's repudiation of his prior statements remained unshaken throughout.

In sum, proof of guilt here consists of a prior unsworn out-of-court statement given by an apparent accomplice under threat of prosecution and thereafter repudiated under oath. We think this proof "so fraught with uncertainty as to preclude a confident determination of guilt beyond a reasonable doubt." (*People* v. *Reyes,* 12 Cal.3d 486, 500 [116 Cal.Rptr. 217, 526 P.2d 225].) It fails to meet the necessary standard that it inspire confidence and be of solid value. (*People* v. *Bassett,* 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].) As the court said in *People* v. *Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321], "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact."

The judgment and order are reversed.

Roth, P. J., and Beach, J., concurred.