Filed 12/31/13  P. v. Ortega CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B243283 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA388017) |
| v. | |
| JOSEPH ORTEGA, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Stephen A. Marcus, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

## SUMMARY

Defendant Joseph Ortega shot at a car with five occupants. The targets of the shooting were a former member of defendant's gang, who had "snitched" on defendant's gang-member brother, and the family of the "snitch." Defendant was convicted of five counts of attempted premeditated murder (Pen. Code, §§ 664, 187, subd. (a); counts 1-5), one count of shooting at an occupied motor vehicle (§ 246; count 6), and one count of possession of a firearm by a felon (§ 12021, subd. (a); count 7), as well as firearm (§ 12022.53, subds. (b), (c); counts 1-6), great bodily injury (§ 12022.53, subd. (d); counts 1-3, 6), and gang enhancements (§ 186.22, subd. (b)(1)(C); counts 1-7). Defendant was sentenced to 190 years to life.

On appeal, defendant contends the trial court erred by admitting a prejudicial recording of a 911 call over his Evidence Code section 352 objection, and allowing improper expert testimony. He additionally contends insufficient evidence supports the gang enhancement, and that the prosecutor committed multiple acts of misconduct. Because we conclude no errors occurred, substantial evidence supports the gang enhancement, and no misconduct occurred, we affirm.

## FACTS

Gilbert Manzano joined the El Sereno Locke gang's Ithaca clique when he was 13. Defendant was a member of the gang's Guardia clique. Gilbert was friends with defendant's older brother, Michael, and met defendant when he was 14. When Gilbert was 17, he was interviewed by police for his suspected involvement in a crime, and Michael's name came up. Michael was taken into custody. Because of this, Gilbert was labeled as a "rat" or "snitch." Gilbert fell out of favor with the gang and ultimately dropped out of the gang when he was 19 years old.

Gilbert continued to live with this mother in the gang's El Sereno territory, and to have contact with some of his friends who were gang members. Over time, however, his relationship with the gang became increasingly tense. Members of his gang once chased Gilbert through El Sereno, and tried to gun him down. When Gilbert was in jail at the same time as Michael, he had to be placed in protective custody following an altercation

2

with another gang member. When Michael was released from jail in 2006, he drove by Gilbert's house and called him a "f------ rat." Gilbert knew he was in danger; it was "open season" on rats in gangs. Because of the tension in the neighborhood, Gilbert moved to Hollywood in 2009 with his wife Valerie B. and their two children. When Gilbert was arrested in 2010 for possessing a knife, he told the arresting officer he had the knife for protection because he was being targeted by his gang.

On August 20, 2011, a birthday party was held in El Sereno for the daughter of Gilbert's younger brother, Freddy. Although Gilbert was worried about his safety, he went to the party with his wife Valerie, their two children, and Freddy. When they arrived at the party, there were El Sereno gang members there. They stared at Gilbert, and were texting on their phones. Defendant was at the party and gave Gilbert a "cold stare." When Gilbert asked what defendant was looking at, defendant walked away. Gilbert left the party within 10 or 15 minutes, because he felt "the heat." He left with Valerie, their children, and Freddy.

Gilbert was parked in an alley behind the house where the party was held. Gilbert drove, Valerie was in the front passenger seat, and Freddy and the children were in the back. As they were driving away, defendant jumped out from behind a dumpster in the alley, wearing a black shirt and a black hat, with a gun in each hand. He fired repeatedly at Gilbert's car. Gilbert lost control of the car and crashed. Gilbert got out of the car, and defendant continued shooting at him. Gilbert heard about 20 shots fired. Defendant then ran away. Gilbert was shot five times in his arms. He ran to nearby houses, but no one would help him. He went back to the party and then heard police outside. He told police that El Sereno gang members had shot at him and his family. He told police he was a "drop out" from the gang.

Freddy was 16 years old at the time of the shooting. He testified the party was in celebration of his daughter's first birthday. Freddy noticed members of the El Sereno gang at the party, including defendant, but they left after Freddy's group arrived. Freddy was in the back seat of Gilbert's car when defendant started shooting at them. Defendant was wearing a black shirt and dark St. Louis Cardinals hat. Freddy was shot in the leg.

3

When Gilbert crashed the car, Freddy got out and ran down the alley. He was shot in the buttocks. He also suffered a graze wound to his head. He went to several houses trying to get help, but no one would help him. He eventually saw some police officers, and flagged them down for help.

Valerie testified she saw defendant staring at Gilbert at the party. She knew defendant because he was friends with Valerie's brother. When she and her family were leaving the party, she saw defendant in the alley, wearing a black sweatshirt and black baseball cap. He shot at the car with two guns. Valerie blacked out when the car crashed. When she regained consciousness, she saw Gilbert, Freddy, and her children running down the alley. She ran to her children, and went to a nearby house for help. She had been shot in the abdomen. The children were not shot, but there was a bullet hole in the car seat that one of the children had been sitting in at the time of the shooting.

Flora S. lived very close to the shooting. She heard gunshots and then heard children crying and a woman screaming. She called 911, and let Valerie and the children into her home. Valerie and the children were scared and crying.

Los Angeles Police Officer Eduardo Mercado responded to the 911 call. He saw defendant walking quickly down the street with two guns in his hands. He was wearing dark clothing and a St. Louis Cardinals cap. When defendant saw the police, he threw the guns into the front yard of a nearby house. Officer Mercado ordered defendant to get on the ground. He complied and was arrested. His hands were tested for gunshot residue the evening he was arrested. He had residue on his left hand. The guns defendant threw in the yard matched the bullet casings and bullet fragments found at the scene of the shooting.

On the day of the party, defendant received a text message on his phone: "Hey that foos here inside the party. Him n his lil brother r acting like their all hard." There was a picture of a gun on the phone.

Gilbert did not identify defendant to police at first. He was scared of being labeled a snitch, and did not want to testify in court. After reflecting on it, Gilbert decided he had "nothing to lose" and spoke to detectives. He identified defendant from a photographic

4

lineup. He was 100 percent certain of his identification, and identified defendant during the preliminary hearing and at trial.

Freddy described the shooter to police, but did not initially name defendant because he had not seen him in many years, and did not recognize him at the time of the shooting. Police conducted a field showup, presenting defendant to Freddy while he was being treated by paramedics. Freddy identified defendant as the shooter. He had no doubt about his identification and identified defendant again at trial.

Valerie described the shooter to police, but did not name him. She identified him in a photographic lineup a couple of days after the shooting. She also identified him at the preliminary hearing and at trial. She had no doubt defendant was the shooter.

Los Angeles Police Officer Allan Krish testified as a gang expert. The El Sereno Locke Street gang had between 360 and 400 members. Its territory was bounded by South Pasadena to the north, Valley Boulevard to the south, Alhambra to the east, and Collis Avenue to the west. Members of the gang commonly wore clothing bearing the St. Louis Cardinals emblem. Their primary activities included murder, attempted murder, possessing weapons, narcotics crimes, vehicle theft, robbery, burglary, and witness intimidation. Officer Krish introduced evidence of predicate offenses by two El Sereno members.

In 2010, Gilbert told Officer Krish he had dropped out of the El Sereno gang and was considered a snitch by the gang. He was concerned for his safety and the safety of his family.

Officer Krish opined that defendant was a member of the El Sereno gang. He admitted belonging to the gang during an April 2009 traffic stop. He also had numerous gang tattoos. Defendant's brother, Michael, was also an El Sereno gang member.

Officer Krish testified that being a snitch or a rat had significant repercussions, and would be "dealt with" by the gang. Gangs instill fear in the community that if they communicate with police, they will be harmed. Therefore, witnesses were reluctant to come forward and cooperate with police.

5

Given a hypothetical tracking the facts of this case, Officer Krish opined that the crime was committed for the benefit of the gang.

Gina S. testified for the defense. She lived at the home where the birthday party was held. Gilbert, Freddy, and Valerie arrived at the party without the children. The children came later, with their grandmother. When Gilbert, Freddy, and Valerie left, the children stayed at the party.

Los Angeles Police Officer Alexander Alvarez testified that in 2008, Gilbert admitted belonging to the El Sereno gang. Gilbert said nothing about being a drop out.

## DISCUSSION

Defendant contends the trial court erred by admitting a recording of a 911 call over his Evidence Code section 352 objection, in which Valerie and the children are heard screaming in the background. He also contends the trial court permitted improper expert testimony on the ultimate issues to be decided by the jury. Defendant further contends insufficient evidence supports the gang enhancement, and that the prosecutor committed multiple acts of misconduct.

We are not persuaded by any of these arguments. The 911 call was relevant as to the disputed issue of whether the children were in the car at the time of the shooting, and were attempted murder victims. The jury could not have been surprised to hear the victims of a shooting screaming and crying. Also, the gang expert did not testify about defendant's intent, and did not usurp the function of the jury, and his testimony was more than adequate to support the true finding on the gang enhancements. Lastly, the prosecutor did not engage in any misconduct.

### 1.    911 Call

Defendant moved, in limine, to limit or exclude admission of a recording of Flora S.'s 911 call, contending the recording was minimally probative and highly prejudicial, under Evidence Code section 352. During the 911 call, Valerie and her children could be heard screaming and crying in the background. Also, during the recording, Flora expressed concern about her infant granddaughter ("And my daughter, you know, she just had a baby. Do you think there's going to be something wrong with

6

her?"). The prosecutor argued the recording was probative of Valerie's terror, explaining why she failed to immediately name the shooter to police, as well as the disputed issue of whether her children were present when the shooting took place. The trial court, after listening to the recording, concluded the recording was probative of the fact that the children were present during the shooting.

On appeal, defendant contends the recording was not "probative as to any contested issue in the case and it was unduly prejudicial because the tape contained screaming and reference to an infant not related to this case." He argues the 911 call occurred 18 minutes after the shooting, and therefore did not prove the children were present during the shooting.

Evidence Code section 352 vests the court with discretion to exclude evidence, where the probative value of the evidence is outweighed by the probability that its admission will necessitate undue consumption of time, pose a substantial danger of undue prejudice or confusion of the issues, or mislead the jury. (*Ibid.*) A trial court's ruling to admit or exclude evidence under section 352 is reviewed for abuse of discretion. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) " 'Where . . . a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Ibid.*)

We have reviewed the recording of the 911 call, and the transcript of the recording. Although crying may be heard in the background, there was nothing unduly prejudicial about it. Valerie had been shot; it is to be expected that she, and her children, would be distraught. The sound of the children crying, coupled with Flora's statement about the presence of the children, is highly probative of the fact that they were involved in the shooting. Moreover, Valerie's audible terror explains why she did not immediately name defendant to police. The probative value of the evidence is in no way diminished by the short lapse in time between the shooting and the call. Moreover, Flora's brief

7

reference to her granddaughter could not have inflamed the jury. We therefore find no abuse of discretion in admitting the evidence.

### 2. Gang Evidence

Defendant contends that the gang expert, Officer Krish, improperly testified to ultimate issues of fact, and invaded the province of the jury to decide the case when he testified the crime would benefit the El Sereno gang. The prosecutor posed the following hypothetical to Officer Krish: "I'm going to give you a hypothetical. . . . [¶] . . . [¶] . . . First, assume that an El Sereno gang member is perceived as being . . . a snitch, speaking to law enforcement. He's perceived to have given some information to law enforcement that ends up getting another gang member into trouble. [¶] . . . [¶] . . . [T]his gang member who was perceived as a rat has left the neighborhood. He's expressed fear for his safety, moved out of the neighborhood. [¶] That ex-gang member now comes back to the neighborhood for a party. He has his family with him in his vehicle. . . . [¶] . . . [¶] . . . They go to this party within El Sereno's territory -- I'm sorry -- within that person's gang's -- ex-gang's territory. They attend the party and see that there are a few of this ex-gang member's fellow gang members at the party. The ex-gang member doesn't get a good feeling, starts to feel uncomfortable, and decides to leave. [¶] Before leaving, the ex-gang member has sort of a stare down with a person at the party . . . the brother of the person he was perceived to have snitched on. Both brothers are members of the gang that he's no longer part of. [¶] . . . [¶] As they drive away . . . the ex-felon gang member whose brother was supposedly ratted on . . . begins to fire from two guns . . . into that car."

The prosecutor then asked for Officer Krish's opinion as to whether such a crime would benefit the gang. Defense began to object, and the trial court interrupted to instruct the jury that they were "not to consider that it's this defendant that does it but a purported gang member in this circumstance. Does everybody understand? Because I think the prosecutor sort of may have cut the edge there. But that's what it's supposed to be for, whether or not hypothetically someone in that position -- would that be done for

8

the benefit of, direction of, in association with a gang." Defense counsel objected based on "improper opinion as to the ultimate issue," which the trial court overruled.

Officer Krish opined that the shooting was done for the benefit of the gang. He testified that the gang would "know this individual is down for the El Sereno gang . . . ." The prosecutor responded, "I'm going to stop you right there. You mentioned a particular gang. We're just speaking in hypotheticals here; is that correct?" Officer Krish responded, "That's correct." The prosecutor later asked: "Rival gang members will learn from this hypothetical crime not to be caught slipping? [¶] . . . [¶] . . . What does that mean?" Officer Krish responded, "If a rival gang wants to enter El Sereno territory --" The prosecutor interrupted, and reminded Officer Krish that "[t]here's no gang in the hypothetical."

Officer Krish agreed the hypothetical crime was intended to benefit the gang.

Defendant contends that "despite the efforts of the trial court and to a lesser extent the prosecutor, Officer Krish testified to [defendant's] subjective intent to benefit the . . . gang [because] Krish repeatedly peppered his answers to 'hypothetical' questions with references to El Sereno [and] even testified to the subjective intent of [defendant] when he testified that [defendant] had the specific intent to benefit his gang." However, it is not improper to identify the specific gang in framing, and responding to, a hypothetical which is based on the evidence in the case. (*People v. Vang* (2011) 52 Cal.4th 1038, 1048-1049; *People v. Gardeley* (1996) 14 Cal.4th 605, 612-613, 619-620.) And, an expert may offer opinions about ultimate issues to be decided by the jury as long as the expert does not opine that *defendant* (as opposed to a hypothetical criminal) is actually guilty. (*Vang*, *supra*, at p. 1048.)

Here, the prosecutor never asked the gang expert to opine whether *defendant* was guilty. All of the questions addressed hypothetical gang members and ex-gang members. Under these circumstances, Officer Krish's opinion did not infringe upon the function of the jury.

9

### 3.      Sufficiency of the Gang Evidence

Defendant contends insufficient evidence supports the true finding for the gang enhancement. Specifically, defendant argues Officer Krish's testimony was speculative and unsupported because the evidence demonstrates the crime was self-motivated, and not gang related. Defendant contends the evidence only supported defendant's personal revenge-motive for killing Gilbert, who had "snitched" on defendant's brother, Michael. Defendant also contends the evidence was insufficient to support the enhancement as to the children, as the gang expert testified that shooting children is disfavored by gangs.

We find there was ample evidence of the gang motive for the shootings, and the existence of an additional possible motive does not vitiate the jury's finding that the shooting was committed for the benefit of the gang. Moreover, Officer Krish's opinion that gangs generally do not support shooting at children does not render insufficient the substantial evidence that defendant shot at children in this case to benefit his gang. Defendant is merely asking this court to reweigh the evidence.

Before a judgment of conviction can be set aside for insufficiency of the evidence, it must clearly appear that on no hypothesis whatsoever is there sufficient substantial evidence to support the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 575-578; *People v. Redmond* (1969) 71 Cal.2d 745, 755.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Johnson,* at p. 578.) The substantial evidence standard of review is the same when the evidence of guilt is primarily circumstantial. (*People v. Holt* (1997) 15 Cal.4th 619, 668.) We do not reweigh the evidence. Questions of credibility and the weight to be given to the evidence are matters for the jury. (*People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206; *People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

Penal Code section 186.22 provides for increased penalties for a crime "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang

members." (*Id.*, subd. (b)(1).) "It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 (*Ferraez*).) An expert opinion, however, must have some basis in fact, and must not be purely speculative. (See *People v. Gardeley*, *supra*, 14 Cal.4th at p. 618.)

In *Ferraez*, the court rejected a similar argument, where the defendant contended that his drug sales were motivated by his personal goal of raising money to buy a car, rather than to benefit the gang. (*Ferraez, supra*, 112 Cal.App.4th at p. 930.) Expert testimony established that drug sales routinely benefit gangs, as the money can be used to buy weapons or for bail for other members. (*Id.* at pp. 928, 930-931.) Here, the evidence established that defendant shot at a supposed "snitch" in gang territory, and that the gang benefitted from such activity because it enhanced fear in the community, and discouraged "snitching."

This case is unlike those cited by defendant, where improper opinions, which were not based on evidence, were the only evidence supporting a gang enhancement. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 654-655, 662 [expert opinion was speculative; there was no evidence that crime was committed in gang territory or that there was special gang permission to commit the crime]; *People v. Ramon* (2009) 175 Cal.App.4th 843, 849-851 [expert testimony was speculative where the evidence merely showed defendant possessed a stolen truck in gang territory]; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1195-1197 [expert's testimony based only on weak inferences].) Here, Officer Krish's opinion was not based on speculation, but was based on conclusions drawn from a well-established factual record.

Moreover, the prosecutor's theory of intent as to the children, and the other occupants of the car, was that they were in the "kill zone," and that defendant intended to ensure Gilbert's death by killing all of the occupants of the car. The jury was instructed on this theory. (See *People v. Stone* (2009) 46 Cal.4th 131, 137.) Therefore, the expert's testimony that gangs look down upon the killing of children did not render the evidence in support of the gang enhancement insufficient for these counts.

11

## 4. Prosecutorial Misconduct

" ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' . . . Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' . . . Additionally, when the claim [of prosecutorial misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841, citations omitted.)

Defendant complains of multiple incidences of prosecutorial misconduct. However, defense counsel never objected to any of the alleged instances of misconduct on this basis, and never sought an admonition to the jury. Therefore, the claims of misconduct are forfeited. (*People v. Maciel* (2013) 57 Cal.4th 482, 541.)

Even if the claims had not been forfeited, they fail on their merits. Defendant contends the prosecutor failed to disclose evidence during discovery, and therefore "ambushed" the defense. Specifically, the prosecutor did not disclose that Freddy went to defendant's MySpace page to see a picture of defendant, after Valerie told Freddy that defendant was the shooter. This evidence first came to light following Freddy's cross-examination, where defense counsel emphasized that Freddy had not immediately identified defendant by name to police, even though he had known defendant before the shooting. The prosecutor then revealed that Freddy told her during a pretrial interview that he visited defendant's MySpace page, and that seeing defendant's MySpace picture confirmed defendant's identity as the shooter. The prosecutor sought to introduce this evidence to explain how Freddy was able to later identify defendant by name to police. When queried by the court about whether this evidence was disclosed to the defense before trial, the prosecutor explained that she had not intended to use the evidence at trial. Defense counsel stipulated that the evidence was not withheld in bad faith.

12

We do not find that the late disclosure of this evidence infected defendant's trial with unfairness. Defendant has not explained how he was prejudiced by the late disclosure, he did not seek a continuance to remedy any alleged surprise, and he was allowed to extensively cross-examine Freddy. (*People v. Reyes* (1974) 12 Cal.3d 486, 502.)

Defendant next complains that the prosecutor misled the court. Gilbert testified that he was in custody at the same time as defendant's brother, Michael. At the preliminary hearing, Gilbert testified that while he was in custody, he had a confrontation with Michael that resulted in Gilbert being placed in protective custody. However, at trial, Gilbert testified that it was not Michael, but another gang member, who approached him while he was in custody. When this testimony was elicited, the trial court remarked that it "wasn't [Michael]? [¶] . . . [¶] . . . I thought the incident involved [Michael]." At sidebar, the court told the prosecutor, "I thought you told me the incident involved [Michael]." The prosecutor clarified that Gilbert had testified that it was Michael at the preliminary hearing, but had later changed his testimony at trial. The court indicated that it felt misled and sustained defendant's objection to the testimony on hearsay grounds. However, during an earlier sidebar conference concerning this evidence, before the offending testimony was elicited, the prosecutor clearly told the court that "defendant was confronted [in jail] at the defendant's direction." The prosecutor did not mislead the court; it appears the court was simply confused about the state of the evidence based upon Gilbert's changing testimony.

Defendant also contends the prosecutor ignored the trial court's evidentiary rulings and elicited inadmissible testimony. The prosecutor asked Gilbert if his Ithaca clique of the gang told him the gang thought he was a snitch. The trial court sustained defense counsel's hearsay objection. The prosecutor therefore rephrased the question and asked whether anyone had said anything to Gilbert which led him to believe that his gang thought he was a rat. The trial court overruled defense counsel's hearsay objection. Clearly, the question had a nonhearsay purpose of explaining Gilbert's reason for separating from his gang. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 820.)

13

Defendant also contends that the prosecutor elicited inadmissible and prejudicial testimony from Gilbert that defendant was "in and out" of jail. However, the prosecutor did not draw out this testimony; rather, she merely asked Gilbert how often he saw defendant.

Defendant also claims the prosecutor committed misconduct when she asked Officer Mercado if defendant admitted to being a gang member at the time of his arrest. Officer Mercado responded that defendant mentioned being a Sereno gang member "when we were obtaining his information." Defense counsel objected, and an Evidence Code section 402 hearing was conducted to determine whether defendant had been *Mirandized*[1] when the question was asked. When it was determined that defendant had not been given *Miranda* warnings before he admitted gang membership, the evidence was deemed inadmissible, and the jury was instructed to disregard the evidence of defendant's gang admission at the time of his arrest. There is no evidence in the record that the prosecutor knew that defendant's admission of gang membership occurred before defendant received a *Miranda* warning. Moreover, given the overwhelming evidence of defendant's gang membership, the trial was not infected with unfairness by this brief reference to defendant's gang affiliation.

Defendant also complains that the prosecutor elicited testimony from the gang expert, Officer Krish, that Krish believed defendant was a gang member because other officers told him defendant was a gang member. The trial court ultimately sustained defendant's hearsay objection to this testimony. However, experts are routinely allowed to rely on hearsay evidence in forming their opinions. (*People v. Linton* (2013) 56 Cal.4th 1146, 1200.)

Defendant also contends the prosecutor argued with the court. Our review of the record does not reveal any inappropriate arguing, but rather, zealous advocacy.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

14

Defendant contends that the prosecutor misstated the law and tried to shift the burden of proof. A prosecutor commits misconduct when he or she misstates the law generally (*People v. Bell* (1989) 49 Cal.3d 502, 538), and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. (*People v. Hill* (1998) 17 Cal.4th 800, 831-832; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215.) Here, the prosecutor argued, during closing, that "there is not exact duration of time for what is willful, deliberate, and premeditated. It varies from person to person and depending on the circumstances. [¶] But there's an example that I know we do in our daily lives, and maybe you don't even think about it, an example of being willful, deliberate, and premeditated." The prosecutor went on to describe the thought process a driver might engage in when deciding whether to pass through or stop at a yellow traffic light. These remarks did not misstate or trivialize the prosecutor's burden of proof. The remarks merely provided an example of how quickly a premeditated decision can be made. (See *People v. Gonzales* (2011) 52 Cal.4th 254, 294 ["[p]remeditation and deliberation . . . can occur in a brief interval"].)

These comments are nothing like the error in *People v. Nguyen* (1995) 40 Cal.App.4th 28, relied upon by defendant, where the prosecutor argued "that people apply a reasonable doubt standard 'every day' and that it is the same standard people customarily use in deciding whether to change lanes." (*Id.* at p. 36.) Here, the prosecutor did not comment on the reasonable doubt burden of proof.

Defendant contends the prosecutor misstated facts during her closing argument, when she asked the jury to listen to portions of the 911 call that were not officially transcribed, where Valerie is heard making various statements in the background. The prosecutor displayed her own transcript of the statements on the overhead projector during argument. In the recording, Valerie is heard saying, "We were in the car, coming from a birthday party, in the alley." "The guy, he was waiting for us in the alley. The guy is from El Sereno. I seen him. I seen him." The official transcript of the 911 call, however, includes Valerie's statement that, "My husband's been shot, and he ran from the car they shot us, while coming through the alley." Defendant posits that the

15

prosecutor's argument that Valerie referred to a single shooter misstates the evidence, because the official transcript does not include her reference to "the guy" who was waiting for them in the alley but does include her statement that "they" shot us. But there was nothing wrong with the prosecutor asking the jury to listen to the untranscribed part of the audio recording of the 911 call that had been admitted into evidence and to decide whether in *that* part of the call, Valerie referred to a single shooter.

Lastly, defendant contends that trial counsel rendered ineffective assistance for failing to object to the prosecutorial misconduct. But, as we discussed above, there was no misconduct, and therefore any objection would have been meritless. (*People v. Williams* (1997) 16 Cal.4th 635, 661; *People v. Mitchell* (2008) 164 Cal.App.4th 442, 466-467; *People v. Chaney* (2007) 148 Cal.App.4th 772, 778.)

## DISPOSITION

The judgment is affirmed.


GRIMES, J.


WE CONCUR:



BIGELOW, P. J.



FLIER, J.


16