Filed 4/21/15  P. v. Aguilar CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067419 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. HEF970248) |
| JESSE AYALA AGUILAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Gary B. Tranbarger, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jesse Ayala Aguilar of 21 felony counts of child sexual abuse involving five different girls.  The convictions included two counts of forcible oral

copulation (Pen. Code,[1] § 288, subd. (c)(2)); five counts of forcible rape (§ 261, subd. (a)(2)); two counts of forcibly committing lewd and lascivious acts on a victim under the age of 14 years (§ 288, subd. (b)(1)); four counts of lewd and lascivious acts on a victim under the age of 16, and at least 10 years younger than the defendant (§ 288, subd. (c)(1)); and eight counts of committing lewd and lascivious acts on a victim under the age of 14 (§ 288, subd. (a)). The jury also found the defendant committed an offense against more than one victim (§ 667.61, subd. (e)(5)).

The court sentenced Aguilar to an indeterminate term of 259 years to life in prison.

Aguilar appeals raising two issues which were never raised in the trial court. He contends the prosecutor committed misconduct in closing argument by referring to him as a "monster" and an "animal." Recognizing the issue has likely been forfeited, Aguilar claims his counsel was ineffective for failing to object to the remarks. Additionally, he argues his sentence is cruel and unusual, largely because it exceeds the lifetime of a human being.

We will find both issues have been forfeited for failure to timely raise them in the trial court. We will find Aguilar has not met his burden to prove ineffective assistance of counsel, because there was no error in the prosecutor's remarks and because, on this record, counsel may have had a valid tactical reason for not raising the issue in response to the prosecutor's brief comments.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

We will also reject the claim of cruel and unusual punishment on the merits of the contention. The sentence of 259 years to life is functionally no different than a sentence of life without parole. Both sentences exceed the life expectancy of a human. Further, the lengthy, despicable, sexual abuse of five minor children resulting in 21 felony convictions abundantly supports the effective life-without-parole sentence imposed in this case.

STATEMENT OF FACTS

Aguilar does not contest the admissibility or the sufficiency of the evidence to support his conviction. Accordingly we will adopt the statement of facts from the respondent's brief as a fair summary of the evidence taken in the light most favorable to the trial court judgment.

A. Appellant's Molestation of Jane Doe 1

Jane Doe 1 was born in November 1981. Her older sister, Tamara,[2] married appellant in 1995, when Doe 1 was around 14 years old. Doe 1 accompanied Tamara and appellant to Mexico for several days following the wedding. During their first night in Mexico, several people, including Tamara, appellant, and Doe 1, slept on the floor in the same room. Appellant touched Doe 1 as she was falling asleep. He put his hands under her clothes and touched her breasts for about a minute or two. He also grabbed her inner thigh and rubbed her vagina. Doe 1 was scared and too shocked to move.

---

[2]    The records indicates that Tamara went by several different last names. We refer to her by her first name so as to avoid any potential confusion.

Prior to touching Doe 1 in her sleep, appellant told her to take off her shirt when she went to the beach. Appellant also made several additional advances over the course of the trip. He grabbed Doe 1's waist, told her she was sexy, and tried to kiss her. Doe 1 did not tell anyone about the abuse because she was scared and ashamed.

Doe 1 stayed at appellant and Tamara's house during the summer of 1995. Appellant proceeded to molest Doe 1 several times. The first time, appellant approached Doe 1 as she slept. Appellant was wearing only his underwear. He told Doe 1 to be quiet, and he touched her breasts, thighs, and vagina under her clothing. In addition to rubbing Doe 1's vagina, he also penetrated her with his finger, which was painful. Doe 1 asked appellant to stop several times, but he spoke to her in a mean and threatening tone and told her to be quiet. Doe 1 was afraid.

The next night, appellant once again approached Doe 1 while wearing only his underwear. Doe 1 was sleeping on the couch, and appellant covered her mouth and told her to be quiet. He pulled down his underwear and removed his penis, which was erect. He grabbed Doe 1 by the back of her head and forced his penis into her mouth. Doe 1 tried to pull away, and she ultimately bit down on appellant's penis. Doe 1 was afraid of appellant, and feared losing touch with her sister if she told anyone what appellant did to her. The next morning, appellant gave Doe 1 a menacing look.

Doe 1 stayed at appellant and Tamara's house on another occasion when her parents went on a cruise to Mexico. As she slept on the couch, appellant approached her wearing only his underwear. He shoved socks into Doe 1's mouth and pulled down her pants. Doe 1 struggled, kicked, and pushed appellant, but he overpowered her and

4

vaginally penetrated her for about 10 minutes. Appellant told Doe 1 to be quiet, and warned her that it would "be the end of her" if she said anything. Appellant might have ejaculated inside of Doe 1. The next morning, appellant told Doe 1 she was sexy, and he again ordered her to keep quiet. Although he continued to touch her waist and put his arms around her, he did not rape or otherwise molest her for the remainder of the visit.

Appellant also raped Doe 1 at her own house. The first time, appellant went into the bathroom, where Doe 1 was attending to her wounded pet parakeet. Appellant pulled down Doe 1's pants and put her on the sink, where he proceeded to rape her despite her pleas for him to stop and let her go. Appellant put his finger over his mouth and said, "shh-shh," and pretended that he was only talking to Doe 1 about her bird. Doe 1 feared for her life, but did not want to lose her sister. Doe 1 eventually talked to Jane Doe 4, who was one of Doe 1's best friends. Doe 1 told Doe 4 that she was uncomfortable around appellant.

On another occasion, appellant entered Doe 1's room in the middle of the night. Appellant pulled Doe 1 out of bed and sternly told her to get up. He then grabbed her shoulders, pushed her down, and told her to be quiet. He shoved his penis into her mouth and vagina, and told her she was sexy. The encounter lasted around six minutes.

Appellant also raped Doe 1 in the shower. Doe 1 went into the bathroom and took off her clothes. Upon entering the shower, she discovered appellant lying down naked in the bathtub. He put his hands over Doe 1's mouth and told her to be quiet. He then bent her over and raped her for over 20 minutes. He also touched and grabbed her chest, her bottom, and her thighs, and he kissed her on the neck and ear. Appellant told Doe 1 to be

5

quiet in a very stern voice, and he warned her that she would get into trouble if she said anything, and that she would never see her family again.

Appellant raped Doe 1 another time after driving her to an isolated location behind a large hill. She tried to fight and yell, but appellant loudly told her to shut up. Appellant also raped Doe 1 on numerous other occasions.

Doe 1 told appellant's niece, Jane Doe 5, that appellant did inappropriate things to her. Doe 5 asked Doe 1 to speak up, because Doe 5 could not. Doe 1 also eventually told Doe 4 that appellant raped her and took her virginity. Doe 1 became closed off, angry, and suicidal. She cut her wrists and legs and also tried to shoot herself.

Doe 1's father, John John M., eventually asked Doe 1 whether appellant touched her, and the police interviewed Doe 1 in November. Doe 1 wrote a letter and gave it to Doe 4, and Doe 4 turned the letter over to the police. In that letter, Doe 1 discussed some of the abuse that appellant inflicted on her.

### B. Appellant's Molestation of Jane Doe 2

Doe l's younger sister, Jane Doe 2, was born in December 1987. Appellant molested Doe 2 when she was only eight years old. The first time, appellant offered Doe 2 a piggyback ride. He then fondled Doe 2's vagina for about 30 seconds, until Doe 2 asked him to stop. Appellant also touched Doe 2's vagina in a similar manner during another piggyback ride. However, this time he did not stop when Doe 2 asked him to. Appellant only let Doe 2 down when she kicked him.

In addition to touching Doe 2's vagina while taking her on walks, appellant touched Doe 2 when they were returning from the video store. He tickled her leg and

6

touched her vagina over her clothes for about a minute. He also might have touched the skin of her vagina while driving to the gas station.

Once, after taking a shower, appellant summoned Doe 2 to bring him a washcloth. Appellant was naked, and he had an erection. Appellant also instructed Doe 2 to feed him grapes in a "sexual" manner. This involved Doe 2 placing her fingers into appellant's mouth.

### C. Appellant's Molestation of Jane Doe 4

Doe 4 was Doe 1's good friend. She was born in August 1982. Doe 4 play wrestled with appellant when she was around 14 years old. While wrestling, appellant put his hand into Doe 4's shirt. He reached underneath Doe 4's bra and touched her breast and nipple in a slow, intentional manner. Doe 1 walked into the room and kicked appellant in the genitals.

### D. Appellant's Molestation of Jane Doe 3

Jane Doe 3 was Doe 1 and Doe 2's cousin. She was born in June 1982. The first time appellant touched Doe 3 was when she was about 14 years old. She went with appellant to a lake near his house. While in the lake, Doe 3 grabbed onto appellant to avoid the sensation of seaweed against her feet. Appellant held Doe 3 up by putting his hand between her legs, and he slipped his fingers into her bathing suit and rubbed back and forth against her vagina. Doe 3 squirmed and tried to get away. Doe 3 did not tell anyone what happened because she was scared, as appellant was strong and into martial arts.

7

Appellant also touched Doe 3 when he and Tamara visited Doe 3's family in November of 1996. Appellant twice went into Doe 3's room at night while wearing only his underwear. The first time, he whispered flirtatiously into Doe 3's ear, rubbed her breasts and abdomen over her clothes, and nibbled her ear. Doe 3 asked him to leave and tried to push his hands away, but appellant persisted and acted as though he was only joking.

The next night, appellant reached his hand under Doe 3's clothing. She tried to push him away and asked him to stop and leave, but he aggressively pinched and grabbed her breasts. The next morning, appellant acted as though nothing was wrong.

A few days later, Doe 3 asked her mother for a lock on her bedroom door. Doe 3's mother asked her why, and Doe 3 told her mother that appellant molested her.

E. Appellant's Molestation of Jane Doe 5

Jane Doe 5 was born in July 1984. Her father was appellant's younger brother. Doe 5 spent a lot of time with appellant when she was growing up, and appellant molested her until she was around 11 years old.

Appellant first touched Doe 5's vagina when she was only 4 years old. He began having Doe 5 touch his penis around the same time. Appellant touched Doe 5's vagina over 200 times, using both his hands and his penis. Appellant had Doe 5 touch his penis using her hands over 100 times, and he specifically had her masturbate him around 50 times. Appellant told Doe 5 that if she loved her family, and if she loved him, she would touch his penis. Appellant threatened to kill Doe 5 if she told anyone about the abuse,

8

and he warned her that her family would disown her if she said anything. He relied on physical force when Doe 5 resisted.

Appellant began forcing Doe 5 to orally copulate him when she was in kindergarten, and he continued to do so until she was around 10 years old. He frequently forced her to orally copulate him while in the car, and he often pulled her head towards his penis. Appellant told Doe 5 that she would perform oral sex on him if she loved him. As Doe 5 got older, appellant began ejaculating into her mouth with increasing regularity. Doe 5 was afraid, and she did not feel as though she could resist appellant or leave.

Appellant told Doe 5 that he was looking forward to her first period, and that he was waiting until her 15th birthday to have sex with her. Appellant began simulating sex with Doe 5 when she was around nine years old. He rubbed his erect penis against her body, sometimes while she was clothed, and sometimes while she was naked. This simulated sex occurred on a "handful" of occasions.

After her ninth or 10th birthday party, Doe 5 saw appellant have sex with a neighbor, who was about Doe 5's age. Appellant may have also had sex with the neighbor's sister. Doe 5 told an investigator that she was in the room, presumably out of view, during one of the occasions where appellant touched Doe 1. Appellant showed Doe 5 pictures of himself having sex with his former wife. He also made Doe 5 copulate him in a hotel room where others, including his then-wife, were sleeping.

After the case involving Doe 1 and Doe 2 was underway, Doe 5's grandparents took Doe 5 to Mexico, where appellant tried to put his hands down Doe 5's pants. After

Doe 5 told her grandparents that appellant touched her, appellant told her in a threatening voice to tell them that it was just a dream.

F. Appellant's Denial of his Guilt and Attempts
to Escape Criminal Liability

John M. was the father of Doe 1 and Doe 2. His brother was Doe 3's father. In 1996, Doe 3's father called John M. Based on that conversation, appellant asked Doe 1 and Doe 2 whether appellant molested them. They answered in the affirmative.

Accompanied by his brother and his father, John M. confronted appellant. Appellant said he was sorry and that he was diabetic and sleepwalked. He claimed that as he slept, he did certain things that he could not remember. During a subsequent phone call with John M., appellant mentioned a Bible passage that suggested that a sinner should cast off part of his body, for it is "more profitable for you that one of your members perish than for your whole body to be cast into hell." Appellant cut off his pinkie finger and highlighted the passage that he quoted to John M. in his daughter's Bible.

Appellant was charged with various counts of sexual molestation, and he was arraigned on June 23, 1997. When appellant failed to appear in court, a warrant was issued for his arrest. Appellant contacted Tamara and told her that he would run forever because he was not going to jail.

In 2009, appellant voluntarily returned to court and requested to be placed on the court's calendar. However, he once again failed to appear in court as ordered. While evading arrest, appellant assumed the identity of his deceased brother. In February of

10

2012, officers located and arrested appellant. They identified him in part based on his missing finger.

DISCUSSION

I

*PROSECUTORIAL MISCONDUCT*

During her closing argument the prosecutor made several disparaging comments about Aguilar. The comments were made in the process of describing what she contended Aguilar had done to the five girls and how he had attempted to avoid responsibility for his behavior. In the first comment the prosecutor referred to one of Aguilar's acts assaulting one of the children in her bedroom. She said: "He preys upon her in her own home, in her own bedroom. Again--again, so horrific, so violent. Right? Children wake up in the night from their worst nightmares of being preyed upon by a monster in their bedroom. And for these girls, they were. Their nightmares were true."

Later, in describing the experience of one of the girls, the prosecutor said: "What she testified to was so horrific and disgusting and repulsive one couldn't even imagine doing those things to a small girl. And you get to hear about everything because you get to have perspective of how it started; right? And what a sick, pathetic--he's not even a man--an animal, a monster. To take a small child and prey on their vulnerability and their pure innocence . . . ."

The final comments came at the end of the prosecutor's opening argument. She said: "I imagine that [the] defense will come up here and comment on the words that I used throughout the trial, opening and closing. And the truth is, I'm not trying to implore

11

to your emotions or your sensibilities or your passions. Fact is fact. What happened here is revolting. What happened here is disgusting. This man is not even a man. He's a monster. He's a monster. So now it's your time. Now it's your time as a jury. You've listened to all the evidence in this case. You have the law before you. It's your opportunity to go back there and deliberate and hold him accountable. Make it known that you did not fall for his baloney over the years. Right? Where he's tried to say one thing or another about what's happened. Sleepwalking. It was an accident. Who knows."

As we have noted, no objection was made to the prosecutor's remarks and there was no request for an admonition by the court.

Aguilar now contends no objection was necessary; that the comments were prejudicial and denied him a fair trial. He further contends that his trial counsel was ineffective for failure to object. We will reject each contention.

### A.  Legal Principles

In order to preserve a claim of prosecutorial misconduct in closing argument, a defendant must ordinarily make a timely objection or the claim will be forfeited on appeal. (*People v. Montes* (2014) 58 Cal.4th 809, 890; *People v. Frye* (1998) 18 Cal.4th 894, 969-970.) We ordinarily assume a timely objection and appropriate judicial admonition will cure any perceived error arising from the prosecutor's comments. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 665-666; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030-1031 (*Edelbacher*).)

Opprobrious comments may be permissible where the facts of the case warrant such descriptions. In *Edelbacher, supra,* 47 Cal.3d at page 1030, the court approved comments that referred to the defendant as a "snake," "contract killer" and "pathological liar." Other cases have found that where the facts support such comments, terms like "monster," "sociopath," and "reprehensible excuse for a human being," were not improper. (*People v. Montes, supra,* 58 Cal.4th at p. 890.)

As the court said in *People v. Stanley* (2006) 39 Cal.4th 913, 951-952, a prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness.' "

The question presented in the cases which have discussed these types of remarks has been whether the facts as presented by the prosecution could reasonably warrant such strongly worded descriptions. We will consider that question here in light of the record before us.

## B. Forfeiture

It is manifestly clear on this record that Aguilar's claims of prosecutorial misconduct have been forfeited by failure to timely object. Our Supreme Court has long held that one ordinarily must make a timely objection to the prosecutor's comments in order to preserve the issue for appeal. (*People v. Reyes* (1974) 12 Cal.3d 486, 505.) Defense counsel could have objected, but did not thus the issue is not properly before us.

Aguilar argues that an objection would have been futile. Nothing in the record supports that contention. While strongly worded, there is nothing in the prosecutor's comments that is so astounding that a timely objection and admonition could not have

13

cured any perceived prejudice. In light of the testimony about the disgusting and, indeed horrific nature of Aguilar's conduct, there is no likelihood the term "animal" or "monster" would have so shocked the jury that the alleged harm would be incurable. Thus, we are satisfied that the failure to timely object to any of the prosecutor's remarks forfeited the issue of misconduct.

## C. Substance of the Remarks

Like many of the Supreme Court cases which have found similar arguments to be forfeited, we will comment briefly on the merits of the contention, notwithstanding finding forfeiture. (*People v. Reyes, supra,* 12 Cal.3d at p. 505; *Edelbacher, supra,* 47 Cal.3d at pp. 1029-1031; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1171-1173.)

The evidence at trial portrayed a manipulative and depraved adult who systematically preyed upon children for years. He raped a 14-year-old girl multiple times and threatened to kill her. He repeatedly molested four other girls. One of the girls, beginning at age five, was required for years to orally copulate Aguilar, over and over. When he was found out, he lied, and manipulated. He failed to appear in court and absconded for nine years. Once back in court, he managed to get released and absconded for another three years, using the identity of his deceased brother.

While we do not endorse terms like "monster," "less than human," "not even a man," we recognize our Supreme Court has repeatedly held such remarks, where warranted by the facts, are not misconduct. Applying that standard, we cannot quarrel that the person described in these facts justly deserves the opprobrium visited upon him by the prosecutor.

14

Most of the authority relied upon by Aguilar on this issue is taken from various United States Circuit Courts of Appeal. While we always consider the reasoning of the federal appellate courts, we follow the decisions of our Supreme Court. (*Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In short, no misconduct has been shown in this record.

### D. Ineffective Assistance of Counsel

Recognizing the issue of misconduct has likely been forfeited, Aguilar contends counsel was ineffective for failing to object. Aguilar makes this claim based as to why counsel made the decision to ignore the prosecutor's remarks only on the record before us. Of course, there is no explanation in the record for counsel's decision. We are thus left to resolve the issue without any specific information as to whether counsel made a tactical decision or a mistake. As the court noted in *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267, it is difficult to resolve a claim of ineffective assistance of counsel on an appellate record where the claim is based on counsel's failure to take a specified action and there is no explanation as to why counsel made a decision not to act. Those issues must often be resolved by petition for writ of habeas corpus where additional facts can be determined.

Under the standards set forth in *Strickland v. Washington* (1984) 466 U.S. 668, the defendant bears the burden of establishing counsel's performance was below the appropriate standard of care and that as a result the defendant was prejudiced. We give deference to counsel's tactical decisions, unless they are shown to be unreasonable.

15

Here we have no way to determine why counsel elected not to object. It could be that counsel determined the best approach was to ignore the remarks. The defense, presented in argument, was one of reasonable doubt based on inconsistencies in the victims' statements over the years. Counsel could have recognized the behavior described by the witnesses was horrendous and that it was the better tactic to focus on reasonable doubt as to the accuracy of the victims' testimony than to emphasize the opprobrious remarks by making an issue out of them. Of course, we do not know the reasons for counsel's action.

Accordingly, Aguilar has not met his burden to show error by trial counsel. And, as we have discussed above, in any event, the prosecutor's remarks were not misconduct.

II

*CRUEL AND UNUSUAL PUNISHMENT*

Aguilar contends, for the first time on appeal, that his 259-year-to-life sentence is cruel and unusual under both the federal and state constitutions. He does not provide any information on comparative sentences for similar crimes in this or any other jurisdictions. His argument is based primarily, if not entirely, on Justice Mosk's dissenting opinion in *People v. Hicks* (1993) 6 Cal.4th 784, 797. There Justice Mosk criticized sentences, such as the one in this case, where the term prescribed well exceeds the life expectancy of a human being. Justice Mosk repeated those views when he criticized a lengthy sentence in his dissent in *People v. Deloza* (1998) 18 Cal.4th 585, a case involving a 111-year sentence. However eloquent, the dissenting opinions in those cases do not reflect the views of the majority of our Supreme Court.

16

We approach the sentence in this case with the recognition it is equivalent to a life without parole sentence. Both forms of sentence exceed the life expectancy of a human being.

As has been well described above, Aguilar has been convicted of 21 serious felonies against five separate victims. His crimes were callous and destructive and spanned many years. Aguilar has presented no authority or analytical basis for us to conclude that this essentially life-without-parole sentence shocks the conscience, or is grossly disproportionate to the severity of the crimes. (*In re Lynch* (1972) 8 Cal.3d 410, 425-427; *In re DeBeque* (1989) 212 Cal.App.3d 241, 254-255; *Rummel v. Estelle* (1980) 445 U.S. 263, 271.)

The sentence imposed here is heavy, but not disproportionate to the severity of the crimes nor does it offend fundamental notions of human dignity.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

17