Filed 2/10/26  Gribbon v. Vosburgh CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| JAMES GRIBBON, | D086157 |
| Petitioner and Appellant, | |
| v. | (Super. Ct. No. PRRI2200180, PRRI2100639) |
| SHALENE VOSBURGH, | |
| Objector and Respondent. | |

APPEAL from a judgment of the Superior Court of Riverside County, Godofredo Cuison Magno, Judge.  Affirmed.

Law Office of Rodney Gould and Armine Singh for Petitioner and Appellant.

Perryman Law Firm and Mark D. Perryman; Arias & Lockwood and Christopher D. Lockwood for Objector and Respondent.

# I. INTRODUCTION

James Gribbon filed a probate petition seeking to invalidate two revocable transfer on death deeds (TODs)[1] executed by his mother, Muriel Alexis Fries (Decedent). Gribbon asserted the TODs were invalid on several grounds, including undue influence from his sister, Shalene Vosburgh. The trial court found in Vosburgh's favor, leading to Gribbon's current appeal. Gribbon argues the trial court misapplied undue influence law and improperly excluded testimony from an expert and percipient witness. Finding one harmless error in the exclusion of the expert's general opinion and the remainder of Gribbon's claims unconvincing, we affirm.

# II. BACKGROUND

## A. *Factual Background*

Decedent was an alcoholic. For several months in 2017, Decedent was incarcerated for driving under the influence. During that time, Gribbon wrote numerous checks to himself from Decedent's account.

After a series of hospitalizations in 2018, Decedent was transferred to an outpatient hospice care facility. At that point, Decedent was not expected to live much longer. Gribbon disposed of all of Decedent's personal property located in her apartment, and he sold Decedent's beloved pet bird, Daisy. Vosburgh disconnected Decedent's cell phone.

In June or July of 2018, Decedent made an unexpected recovery and left the hospice facility. Decedent stayed with Vosburgh for approximately two weeks and in July 2018 moved into Brookdale Senior Living (Brookdale), an assisted living facility. Vosburgh did not notify Gribbon that Decedent left

---

[1] A TOD "[m]akes a donative transfer of real property to a named beneficiary," "[o]perates on the transferor's death," and "[r]emains revocable until the transferor's death." (Prob. Code, § 5614, subd. (a).) All further undesignated statutory references are to the Probate Code.

hospice and moved into Brookdale. Vosburgh provided Decedent with a new cell phone, but she did not place Gribbon's number into it.

On September 2, 2019, Decedent executed two TODs naming Vosburgh as the sole beneficiary of Decedent's two California real properties. These real properties were Decedent's primary assets. Decedent died on January 3, 2021.

## B.    Trial Proceedings

On April 12, 2021, Gribbon filed a petition seeking to set aside the TODs. Gribbon alleged the TODs were invalid because Decedent lacked capacity when she executed them, and because they were the product of duress, menace, fraud, undue influence, and financial elder abuse from Vosburgh.

The petition proceeded to a bench trial. Gribbon testified, stating that Decedent authorized his withdrawals from Decedent's checking account while she was in jail. According to Gribbon, Decedent wanted to pay Gribbon for taking care of her apartment and her birds,[2] and for fixing her car. Gribbon also stated that he and Vosburgh agreed to empty Decedent's apartment while Decedent was in hospice. The agreement was for the two siblings to keep what they wanted, donate the remainder of Decedent's property, and to sell Daisy to the pet shop where Decedent purchased her. Gribbon asserted that Vosburgh helped him remove items from Decedent's apartment, and that he and Vosburgh split the proceeds from Daisy's sale.

Gribbon testified that he lost contact with Decedent because Vosburgh removed her from the hospice facility without telling him and Decedent's phone was disconnected. Gribbon unsuccessfully attempted to find Decedent

---

[2]    Decedent had another bird in addition to Daisy, but it died while Gribbon was taking care of it.

3

at various assisted living facilities, and Vosburgh never told him where Decedent was.

On the other hand, Vosburgh testified that while Decedent was incarcerated, Vosburgh informed Decedent that money was missing from her checking account, and Decedent believed Gribbon was stealing from her. Vosburgh also stated that Gribbon unilaterally disposed of Decedent's property and sold Daisy while Decedent was in hospice.

According to Vosburgh, Decedent did not want any contact with Gribbon, and she wanted to leave her real properties to Vosburgh because Gribbon emptied her apartment and sold Daisy. Vosburgh stated that she and Decedent hired attorney Stephen Ensberg to draft the TODs and, that at Decedent's direction, Vosburgh informed Ensberg that Decedent wanted to disinherit Gribbon.

Vosburgh further testified that Decedent managed her own finances while at Brookdale. Decedent arranged for all her bills to be paid automatically, and Vosburgh deposited Decedent's rental income checks because Decedent did not have a car. Vosburgh also explained that Decedent executed the TODs at Vosburgh's house during a barbeque. Friends and family attended the gathering, but no attorneys were present.

Ensberg testified, stating that he met personally with Decedent in May 2018, at which time Decedent intended to give one real property to Vosburgh and one to Gribbon. Ensberg explained that Decedent authorized Vosburgh to communicate with Ensberg on her behalf, and Vosburgh subsequently told Ensberg that Decedent wanted to leave both of her real properties to Vosburgh. James Berkedal, an attorney who worked for Ensberg, testified that the initial draft of the TODs gave one property to each child, and

4

Decedent did not personally convey the change that resulted in both properties go to Vosburgh.

Martiza Lujan, Brookdale's executive director, testified on behalf of Gribbon. At one point, Gribbon's counsel attempted to elicit testimony from Lujan based on the Brookdale records she reviewed.[3] Citing *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), the trial court limited Lujan's testimony to matters that she personally observed. Based on her observations, Lujan testified that Decedent enjoyed drinking alcohol, she refused to take her medications on a few occasions because she was intoxicated, she refused to eat meals and needed reminders to eat, and she needed assistance understanding what the time of day was, and managing her finances. Lujan also stated that Decedent was never admitted to memory care at Brookdale and she was able to freely leave the facility.

Gribbon presented expert testimony from Dr. Emin Gharibian, a psychologist. Gribbon's counsel asked Dr. Gharibian if he formed an opinion regarding Decedent's capacity on September 2, 2019. The trial court instructed Gribbon's counsel to lay a foundation, so she asked Dr. Gharibian what records he reviewed in forming his opinion. Dr. Gharibian stated he reviewed records from Hoag Hospital and Brookdale, as well as the depositions of Lujan and Albert Beck, Decedent's boyfriend.

When counsel again asked if Dr. Gharibian formed an opinion on Decedent's capacity, the trial court sustained an objection from Vosburgh's counsel and excluded the opinion based both on lack of foundation and hearsay issues described in *Sanchez*. The trial court reasoned that the documents reviewed by Dr. Gharibian had not been admitted, and the

---

[3]   At the end of trial, the trial court admitted only one page from the Brookdale records, identified "005" from Exhibit 4. Exhibit 4 in the appellate record contains a single page that states, "BROOKDALE004" at the bottom.

matters that Dr. Gharibian would be testifying to were not independently admissible. The trial court then permitted Dr. Gharibian to opine that a person's inability to manage finances, medications, and time could potentially impact that person's ability to read and understand a legal document.

In his closing argument, Gribbon asserted that the TODs were presumed to be the product of undue influence under section 21380 and case law. Gribbon further asserted that aside from any presumption, the evidence established that Vosburgh unduly influenced Decedent.

## C.     *Trial Court's Ruling*

At the end of trial, the trial court announced its ruling from the bench. The trial court determined that Gribbon failed to carry his burden in proving Decedent lacked capacity or that Vosburgh committed financial elder abuse or fraud. The trial court found that Decedent was "doing fine" while at Brookdale, and when Decedent executed the TODs, she was "alert," "attentive," "coherent, lucid, competent," and "able to process information." The trial court further stated that Decedent "was fully aware of . . . the real property[] that she had. And . . . it was not taken by fraud or secreted from her or misappropriated in any way."

Regarding undue influence, the trial court stated,

> I find that Ms. Vosburgh influenced Ms. Fries, gave her information regarding, perhaps, Mr. Gribbon's misdeeds from the past; gave Ms. Fries information about the check writing that, again, and I'm not taking this for the truth, but this is information that Ms. Fries received, whether she believed it or not or whether it is true or not, that is not for me to determine, but this is the information she had.
>
> And I do believe that Ms. Vosburgh informed Ms. Fries of the check writing, that it was Mr. Gribbon who wrote himself checks; that it was Mr. Gribbon who — I'm trying to choose my words regarding the bird. I know there

6

was some argument whether it was stolen, sold, boarded, all of those things, but taken away from Ms. Fries, and she was not happy about that. She did not consent to that.

And, also, regarding her apartment being emptied when she came home, again, I'm not accepting those as, necessarily, the truth, but . . . that [information] was otherwise provided to Ms. Fries.

And based on [that] information, and I even thought about this, essentially, whether they be true, whether they be disinformation, misinformation, it was information that she had, and the question is, having [that] information, whether it be true or not, whether it be mis-, dis-, or lies, when she had [the] information, was she of her free mind, her own volition? Did she voluntarily, knowingly, intelligently make a decision to, nonetheless, give both properties to Ms. Vosburgh? And based on the evidence that I have, that Ms. Fries was actually upset with Mr. Gribbon, whether it be the bird, whether it be because of the checks, the emptied out apartment, that she was upset with Mr. Gribbon, she did not want to communicate with Mr. Gribbon, she did not want to — I think one of the . . . statements that was given was she did not want anything to do with Mr. Gribbon, again, whether that be based on truth, misinformation, that's how she felt.

And based on the feeling, based on the belief, then she did execute a transfer of that deed on her own free will, voluntarily, intelligently, informed, or without duress or coercion, and I do believe that it was. So based on those, I do feel that the Petitioner, Mr. Gribbon, has failed to meet his burden to show that Ms. Fries otherwise executed the [TODs] September 2nd, 2019, that she was under undue influence.

I believe she was influenced, but whether it was "undue," I do not find that it was.

As for the section 21380 presumption, the trial court determined that Vosburgh directed the TODs preparation, Ensberg acted as Vosburgh's attorney, and Ensberg did not confirm with Decedent that the TODs reflected

7

her wishes. Nonetheless, the trial court believed that Decedent signed the TODs "voluntarily, intelligently, knowingly, and without undue influence."

The trial court stated that "fiduciary relationships are recognized as legal relationships," such as "attorney/client, trustee/beneficiary, principal/agent, and relationships among general partners for joint ventures." The court found such a relationship lacking because Vosburgh and Decedent were "mother/daughter," and there was no power of attorney or other recognized legal relationship. Finding section 21380 inapplicable, the trial court stated, "ultimately, I go back to what I believe [Decedent's] intent was at or near the time of the [TODs], and I do believe that it was [Decedent's] intent to give both properties to Ms. Vosburgh." The trial court therefore denied Gribbon's petition.

On November 7, 2024, the trial court entered judgment in Vosburgh's favor. Gribbon's timely appeal followed.

### III. DISCUSSION

A.  *The Trial Court Did Not Misinterpret Undue Influence Law*

Gribbon argues the existence of undue influence in this case is "blatant" and "evident." He points to the evidence indicating that Decedent was an elderly alcoholic residing in an assisted living facility who needed help managing her finances and medication. Gribbon also relies on the trial court's determination that Vosburgh procured the TODs by directing Ensberg as the true client and influenced Decedent's feelings towards Gribbon. Gribbon further contends the trial court erred by failing to consider whether Vosburgh's statements to Decedent about Gribbon were true. Finally, Gribbon maintains that the trial court misconstrued the statutory and common law presumptions of undue influence.

8

### 1. Standard of Review

Gribbon's argument is based in part on the inferences he believes should have been drawn from the evidence. This suggests that he is challenging the sufficiency of the evidence for the trial court's ruling. However, in his reply brief, he states that "the trial court's findings of fact are not being challenged in this appeal." Instead, Gribbon argues that the trial court misinterpreted undue influence law and presumptions "because if they were applied properly to [the trial court's] factual findings, [the trial court's] decision would result in finding Ms. Vosburgh unduly influenced Decedent, or at a minimum a presumption of undue influence exists."

Accordingly, we will not review the sufficiency of the evidence supporting the trial court's findings. Rather, we will review the trial court's application of law to its undisputed factual findings, which is a matter that we review independently. (*Guardianship of Saul H.* (2022) 13 Cal.5th 827, 847.) Nonetheless, we recognize "three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness and (3) the appellant bears the burden of providing an adequate record affirmatively proving error." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

### 2. Undue Influence

Under common law, "[u]ndue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96.) Under the statutory definitions designed to "supplement the common law," " '[u]ndue influence' means excessive persuasion that causes another person to act or refrain from acting

9

by overcoming that person's free will and results in inequity." (§ 86; Welf. & Inst. Code, § 15610.70, subd. (a).)

"[D]irect evidence of undue influence is rarely obtainable and, thus the court is normally relegated to determination by inference from the totality of facts and circumstances. [Citations.] Indeed, there are no fixed definitions or inflexible formulas. Rather, we are concerned with whether from the entire context it appears that one's will was overborne and [s]he was induced to do . . . an act which [s]he would not do . . . if left to act freely." (*Keithley v. Civil Service Bd.* (1970) 11 Cal.App.3d 443, 451.)

    3.    <u>Undue Influence Analysis</u>

Although the trial court found that Vosburgh influenced Decedent, the court expressly stated that influence was not " 'undue.' " This is consistent with the applicable law, under which "[a] party may be led but not driven," and the relevant inquiry is whether "the forces of persuasion have overflowed their normal banks and become oppressive flood waters." (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130, 132.) And while Gribbon is correct that "ordinary force" on "a person of subnormal capacities" may constitute undue influence (*ibid.*), the trial court did not find Decedent to have subnormal capacities. Instead, it found that she was "doing fine," "alert," "attentive," "coherent, lucid, competent," and "able to process information."

As for the preparation of the TODs without Decedent's involvement, that does not mandate a finding of undue influence because the trial court determined that Decedent executed them "voluntarily, intelligently, [and] knowingly," and "that it was [Decedent's] intent to give both properties to Ms. Vosburgh."

10

Similarly, the trial court's refusal to rule on the truth of Vosburgh's statements does not undermine its decision. As correctly noted by the trial court, the "ultimate[]" concern was Decedent's intent. By finding that Decedent was of "her free mind [and] her own volition" without assessing the veracity of Vosburgh's statements, the trial court effectively found that Decedent was capable of making her own decision even if Vosburgh misrepresented Gribbon's actions.

In sum, because the trial court concluded that Vosburgh's actions did not overcome Decedent's free will, it correctly applied undue influence law.

4. Undue Influence Presumptions

There are two separate undue influence presumptions. (*Rice v. Clark, surpa,* 28 Cal.4th at pp. 96–98 [addressing former § 21350, the predecessor to § 21380].) The first is statutory. Section 21380 provides in pertinent part that "[a] provision of an instrument making a donative transfer to any of the following persons is presumed to be the product of fraud or undue influence: [¶] A person who transcribed the instrument or caused it to be transcribed and who was in a fiduciary relationship with the transferor when the instrument was transcribed." "A fiduciary relationship is a recognized legal relationship such as trustee and beneficiary, principal and agent, or attorney and client." (*Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195, 1208.)

Subject to exceptions not relevant here, section 21380 does not apply to "a donative transfer to a person who is related by blood or affinity, within the fourth degree, to the transferor." (§ 21382, subd. (a).)

The second presumption arises under common law and has the following elements: " '(1) the existence of a confidential relationship between the [person who executed the testamentary document] and the person alleged to have exerted undue influence; (2) active participation by such person in the

11

actual preparation or execution of the [testamentary document], such conduct not being of a merely incidental nature; and (3) undue profit accruing to that person by virtue of the [testamentary document].' " (*Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1127.) Unlike the statutory presumption in section 21380, which must be rebutted by clear and convincing evidence (§ 21380, subd. (b)), the common law presumption may be overcome by a preponderance of the evidence (*Keading,* at p. 1127).

    5.    <u>Presumptions Analysis</u>

The trial court correctly determined that section 21380 did not apply. First, the TODs transferred Decedent's properties to her daughter, a blood relative within the fourth degree; therefore, the statutory presumption did not apply pursuant to section 21382, subdivision (a). Although the trial court did not rely on the section 21382 exception, "[w]e review the trial court's ruling, not the reasons stated for the ruling." (*Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 358.)

Second, the trial court correctly stated that "fiduciary relationships are recognized as legal relationships," such as "attorney/client, trustee/beneficiary, principal/agent, and relationships among general partners for joint ventures." Finding no such relationship between Decedent and Vosburgh, which is a required element of section 21380, the trial properly determined that the statutory presumption was inapplicable on this ground as well.

The trial court did not expressly address the common law presumption while announcing its ruling. However, " 'a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made.' " (*Runyan v. Pacific*

*Air Industries, Inc.* (1970) 2 Cal.3d 304, 309–310.)  The trial court found that: Decedent "was coherent, lucid, [and] competent"; Decedent "of her free mind, [and] her own volition," "voluntarily, intelligently, [and] knowingly" executed the TODs despite potential misinformation from Vosburgh; and Decedent "inten[ded] to give both properties to Ms. Vosburgh."  The implication from these findings is that any presumption of undue influence was rebutted by a preponderance of the evidence.  We therefore find no error.

B.     *The Trial Court Did Not Commit Reversable Error in Excluding Portions of Dr. Gharibian and Lujan's Testimony*

Gribbon argues that the trial court erred in applying *Sanchez* and in excluding testimony from Dr. Gharibian and Lujan on several grounds.  We address each of those bases below, finding all but one unpersuasive.  And while we agree the trial court erred in excluding Dr. Gharibian's overall opinion of Decedent's capacity, we find that error harmless.

1.     <u>Standard of Review</u>

"A trial court's evidentiary rulings, including those involving the hearsay nature of evidence, are reviewed for abuse of discretion."  (*Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 876.)  A trial court abuses its discretion if its ruling "rests on an error of law" (*ibid*.) or is " ' "so irrational or arbitrary that no reasonable person could agree with it" ' " (*Property California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1162).  "The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice' — that is, that a different result would have been probable if the error had not occurred."  (*Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871, 888.)

2.    Expert Opinion and *Sanchez*

Expert opinion must be "[b]ased on matter . . . , whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).)  An expert "may state on direct examination the reasons for his opinion and the matter  . . . upon which it is based." (Evid. Code, § 802.)

In *Sanchez*, the California Supreme Court held that "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay.  Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception.  Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez*, *supra*, 63 Cal.4th at p. 684, fn. omitted.)  "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.)

The court in *Sanchez* disapproved of a prior practice that allowed experts to testify to case-specific hearsay when accompanied by a limiting instruction " 'that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth.' " (*Sanchez*, *supra*, 63 Cal.4th at p. 679.)  The court found that "paradigm [was] no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Ibid*.)

14

3.    Analysis

First, Gribbon argues that *Sanchez* is inapplicable to Probate bench trials because a trial judge is presumed to vet unreliable information and the paramount concern is determining the Decedent's intent.  We disagree.

As Gribbon acknowledges, "the *Sanchez* rule concerning state evidentiary rules for expert testimony applies in civil cases." (*In re Marriage of Lietz* (2024) 99 Cal.App.5th 664, 673.)[4]  "Probate matters are civil in their nature." (*Schlyen v. Schlyen* (1954) 43 Cal.2d 361, 371; see also § 1000.)

Additionally, courts have applied *Sanchez* to bench trials.  (See, e.g., *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 9, 36; *People v. Bona* (2017) 15 Cal.App.5th 511, 515; *Bennett v. Superior Court, supra,* 39 Cal.App.5th at p. 868.)  We agree with these appellate courts because the holding in *Sanchez* was not just based on a jury's inability to understand a limiting instruction.  It was also based on general evidentiary principles regarding hearsay and foundations for expert opinion.  (See, e.g., *Sanchez, supra,* 63 Cal.4th at p. 677 ["If no competent evidence of a case-specific fact has been, or will be, admitted, the expert cannot be asked to assume it."]; *id.* at p. 683 ["If the hearsay that the expert relies on and treats as true is *not* true, an important basis for the opinion is lacking."].)  These evidentiary principles apply in contested probate proceedings, where " 'each allegation in a verified petition and each fact set forth in a supporting affidavit must be established by competent evidence.' " (*Dunlap v. Mayer* (2021) 63 Cal.App.5th 419, 426.)  Accordingly, we see no reason to disregard *Sanchez* in probate bench trials.

---

[4]    This is true even though "[t]he portion of *Sanchez* addressing the Sixth Amendment right to confront witnesses does not apply to civil proceedings." (*In re Marriage of Lietz, supra,* 99 Cal.App.5th at p. 673, fn. 4.)

Second, Gribbon claims that for medical diagnoses, there is a common law exception to the rule barring experts from relating case-specific hearsay. But that exception was "generalized" into Evidence Code sections 801 and 802, and *Sanchez* "clarif[ied] the proper application of Evidence Code sections 801 and 802." (*Sanchez, supra*, 63 Cal.4th at pp. 670, 678–679.) As such, Gribbon cannot rely on this common law exception to escape *Sanchez*'s holding.

Third, Gribbon argues that Decedent's medical records qualified under the business records hearsay exception and therefore could have been presented by Dr. Gharibian consistent with *Sanchez*. Gribbon has not provided a sufficient record to prove this contention.

The business records exception only applies if "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271.) "It is the burden of the party offering the evidence to establish that these foundational requirements have been met." (*People v. McVey* (2018) 24 Cal.App.5th 405, 414.)

Business records may contain multiple levels of hearsay, each of which must satisfy a hearsay exception to be considered for the truth. (*Sanchez, supra*, 63 Cal.4th at pp. 674–675.) Additionally, "some medical opinion has been deemed inadmissible under the business records exception of Evidence Code section 1271. (*People v. Reyes* (1974) 12 Cal.3d 486, 502–503 . . . [psychiatric opinion not admissible]; *People v. Terrell* (1955) 138 Cal.App.2d 35, 57 . . . [physician's opinion that patient had criminal abortion not

16

admissible].)  The reasoning in those cases was that to be admissible under the business records exception, the evidence '. . . must be a record of an act, condition, or event; a conclusion is neither an act, condition or event.' " (*People v. Beeler* (1995) 9 Cal.4th 953, 980.)

As for the Hoag Hospital records, Gribbon attempted to lay the foundation with a declaration from a custodian of records, and the trial court found that foundation lacking.  The Hoag Hospital records, including any accompanying declaration from a custodian of records, are absent from the record.  Gribbon has therefore failed to provide an adequate record to review this ruling, so this issue must be resolved against him.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 [" ' "if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed" ' "].)

A similar flaw exists with the Brookdale records.  Although Lujan testified regarding their foundational elements, only a single page from the Brookdale documents made it into the record.  That page is from an unknown author and indicates that Decedent used alcohol and cigarettes and did not suffer from any other physical impairments.  Dr. Gharibian intended to rely on much more than that page in formulating his opinion.  In support of his petition, Gribbon filed an affidavit from Dr. Gharibian which identified the portions of the Brookdale Records on which Dr. Gharibian based his opinion.[5] That information included various notes such as Decedent being "confused/disoriented (mild)" and diagnoses of "Mild Cognitive Impairment" and "Anxiety Disorder."

---

[5]	Gribbon appears to suggest the trial court should have admitted Dr. Gharibian's affidavit.  That affidavit is hearsay without an applicable exception.

17

The sources of the notes Dr. Gharibian referred to in his affidavit are unclear, presenting potential multi-level hearsay problems. Further, the diagnoses Dr. Gharibian referenced are the type of psychiatric conclusions that have been found inadmissible under the business records hearsay exception. (*People v. Reyes, supra,* 12 Cal.3d at pp. 502–503.) Accordingly, we are unable to meaningfully review whether the relevant portions of the Brookdale records qualified for the business records exception or whether they included multiple levels of hearsay. Due to this inadequate record, we must affirm on this issue. (*Jameson v. Desta, supra,* 5 Cal.5th at p. 609.)

Fourth, Gribbon asserts that Decedent's medical records were admissible for the non-hearsay purpose of showing what information Dr. Gharibian relied on in forming his opinion. We disagree. "It has long been the rule that an expert may not ' "under the guise of reasons [for an opinion] bring before the jury incompetent hearsay evidence." ' " (*Sanchez, supra,* 63 Cal.4th at p. 679.)

Fifth, Gribbon argues that the documents Dr. Gharibian reviewed were admissible because prior to trial, the parties stipulated to the authentication and foundation of all evidentiary documents.[6] However, hearsay is a matter separate from authentication and foundation. (Evid. Code, §§ 400, et seq., 1200 et seq., 1400 et seq.) There is no indication that Vosburgh stipulated to admit these documents for the truth of the matters asserted therein.

Sixth, Gribbon contends the trial court improperly applied *Sanchez* to a lay witness when it prevented Lujan from testifying about the Brookdale

---

6    That stipulation stated, "[p]arties stipulate to the foundation and/or authenticity of all exhibits set forth on the joint exhibit list." The amended joint exhibit list included the Hoag Hospital records, the Brookdale records, and Lujan's deposition transcript, but it did not include Beck's deposition transcript.

records she reviewed. We agree that *Sanchez* governs expert testimony and Lujan testified in a lay capacity. Although the trial court cited *Sanchez* when restricting Lujan's testimony to matters that she personally observed, we review the trial court's ultimate ruling (*Mireskandari v. Gallagher, supra,* 59 Cal.App.5th at p. 358), which was correct. As a lay witness, Lujan was limited to testifying based on her personal knowledge and perceptions. (Evid. Code, §§ 702, subd. (a), 800, subd. (a).) She was not competent to testify to matters that she merely read in the Brookdale records.

Finally, Gribbon argues that *Sanchez* did not prevent his trial counsel from eliciting Dr. Gharibian's overall opinion of Decedent's capacity (i.e., without any reference to case-specific facts). We agree. An expert's opinion may be based on inadmissible matter, and *Sanchez* did not change that. (*Sanchez, supra,* 63 Cal.4th at p. 685 ["Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so."].) As such, the trial court misconstrued *Sanchez* and abused its discretion by excluding Dr. Gharibian's opinion on the ground that it was based on inadmissible material. (See, e.g., *Zuniga v. Alexandria Care Center, LLC, supra,* 67 Cal.App.5th at p. 887 [trial court commits legal error by excluding expert testimony "simply because it was based on inadmissible evidence"].)

However, this error was harmless. " '[W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an "expert opinion is worth no more than the reasons upon which it rests." ' " (*Property California SCJLW One Corp. v. Leamy, supra,* 25 Cal.App.5th at p. 1163.) That principle applies here. As explained above, the trial court correctly ruled that Dr. Gharibian was prohibited from relaying the case-specific facts upon which he relied. Dr.

19

Gharibian could not anchor his opinion to any factual predicates to support his reasoning.  Accordingly, while Dr. Gharibian's bare opinion may have been admissible, it was unlikely to change the result based on its lack of evidentiary underpinning.  Indeed, the trial court characterized Dr. Gharibian as "just a reader."  We therefore find the error harmless.

Based on the foregoing, Gribbon has failed to show reversible error regarding the trial court's exclusion of Dr. Gharibian and Lujan's testimony.

## IV. DISPOSITION

The judgment is affirmed.  Vosburgh is awarded costs on appeal.


RUBIN, J.

WE CONCUR:


IRION, Acting P. J.


DO, J.

20